NICHOLS (SMITH v.). See Case No. 13,-084.

---

## Case No. 10,247.

### NICHOLS v. TREMLETT.

[1 Spr. 361; [1] 20 Law Rep. 324.]

District Court, D. Massachusetts. June, 1857.

SHIPPING—CHARTER-PARTY—LAY DAYS—USAGE—DELAYS—RIGHTS OF CHARTERER—DEFICIENCY OF COAL—DEMURRAGE—CROSS LIBELS.

1. By a charter-party, a vessel was to proceed to Pictou, and take a cargo of coal, to be furnished by the hirer. There were to be lay days, as "customary in loading," and "the cargo was to be received as customary," and in case the vessel was longer detained, by the fault of the hirer, he was to pay to the carrier demurrage. There being no custom allowing a particular number of lay days, but a peculiar custom as to the mode of loading, receiving, and furnishing the cargo: *Held*, that each party was bound to conform to such custom.

2. There being but few berths at which a vessel could load, and the custom being for vessels there to take their turn, in the order of their arrival at the port, and those which preceded this vessel being delayed by a deficiency of coal, the turn of this vessel was thereby delayed: *Held*, that the hirer was responsible therefor, such deficiency of coal having arisen from its not being supplied at the customary rate of seven hundred chaldrons per day.

3. The vessel being represented in the charter-party, as then lying in the harbor of Boston, it was the right of the hirer to have her proceed directly from that port to Pictou, without any unreasonable and unusual delay.

[Cited in Lindsay v. Cusimano, 10 Fed. 303.]

4. If the vessel was not at Boston, as stated in the charter-party, but at another port, undergoing repairs, the hirer is entitled to be placed in as good a condition as he would have been, if she had been at Boston, and proceeded directly on her voyage.

5. If, by reason of her not having proceeded directly from Boston, she was subjected to greater detention after her arrival, the hirer is liable for no more demurrage than he would have been, if she had proceeded directly.

6. But if, from a deficiency of coal, she would have been subjected to delay, if she had performed her duty, the hirer will be liable, to that extent, for the demurrage actually suffered.

[Cited in Eleven Hundred Tons of Coal, 12 Fed. 188.]

7. Where, in a libel by a ship-owner, for demurrage under a charter-party, the hirer set up in defence a neglect of duty by the ship-owner, under the same contract, not by way of recoupment, but merely to repel the claim for demurrage: *Held*, that the hirer might afterwards maintain a cross libel, for damages sustained by such neglect.

[Cited in The Two Brothers, 4 Fed. 159.]

---

[1] [Reported by F. E. Parker. Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

8. He might have availed himself of this claim for damages, by way of recoupment in the first suit. But if he had done so, he could not have had a decree for any excess of his damages over the claim of the libellant.

[Quoted in Kennedy v. Dodge, Case No. 7,-701.]

9. Nor could he have sustained a cross libel for such excess.

[Quoted in Kennedy v. Dodge. Case No. 7,-701; The Ciampa Emilia, 39 Fed. 127.]

10. He may elect whether to take his remedy wholly in defence, or wholly by suit.

11. Where such cross suit was instituted, and the libellant in the first suit was out of the jurisdiction, notice on his counsel and proctor in that suit, is not a sufficient service of the cross libel.

[Cited. but not followed, in The Eliza Lines, 61 Fed. 323.]

12. But the court may, in its discretion, stay proceedings in the first suit, until an appearance shall be entered, and other steps taken in the second. Under the circumstances, such stay was ordered.

[Cited. but not followed, in The Eliza Lines, 61 Fed. 323.]

In admiralty.

J. C. Dodge, for libellant.

R. H. Dana, Jr., for respondent.

SPRAGUE, District Judge. This is a libel for demurrage. On the 8th day of August, 1854, the respondent, a merchant of Boston, and the libellant, master of the brig Melazzo, executed a charter-party, by which that vessel was to go to Pictou, and there take a cargo of coal and convey it to New York. The respondent was to be allowed, at Pictou, lay days, as "customary in loading," and "the cargo was to be received as customary," and in case the vessel was longer detained, the respondent agreed to pay to the libellant demurrage, at the rate of thirty Spanish milled dollars, day by day, for every day so detained, provided such detention should happen by his default, or that of his agent.

The vessel arrived at Pictou on the sixth day of September, and was there detained, until the third day of November. It is alleged by the libellant, that this detention far exceeded the customary lay days, and for the excess he now claims demurrage, at the rate of thirty dollars a day. It appears by the evidence, that there is no custom, by which a vessel is to have a particular number of days for loading at Pictou. And the first question is, what is the meaning of the expression in the charter-party, lay days as customary for loading? It is contended by the libellants, that it means such number of days as vessels had theretofore been generally detained for cargoes, and in loading, and that this did not exceed from six to twelve. But, upon the proofs, I cannot adopt this construction. It appears that coal is the only article exported from Pictou. The mines are worked by a company, and it has been their practice to carry on their mining operations throughout the year; the coals raised in the winter, when the harbor is not acces-

sible to vessels, being deposited on the bank, to aid in meeting the demand of the summer and autumn. There are seven berths at which vessels are loaded, all about three miles distant from the mines. It has been the practice of the company to send the coals to the vessels daily, and to supply the demand, up to seven hundred chaldrons a day. By the established custom of the port, vessels take their turns in going to the berths, and loading, in the order of time in which they pass the light in entering the harbor. In the latter part of the summer, and during the autumn of 1854, there was a deficiency in the supply of coal by the company, owing partly to a diminution in the quantity deposited on the bank during the preceding winter, 'and partly to the great number of vessels seeking coal during that season. When this brig passed the light, there were a great number of vessels, which had preceded her, waiting for cargoes, and her extraordinary detention was owing to her being compelled to wait until these had been loaded, and to there being a deficiency of coal. It is contended by the respondent, that the detention in this case was occasioned solely by the custom, which compelled this vessel to wait her turn, and that he is in no way responsible for the delay occasioned by the want of coal for those that preceded her. By the terms of the charter-party, the shipper was bound to furnish a cargo, and I think, that by the true construction of that instrument, the shipper was entitled to such number of lay days as would be necessary to complete the loading of this vessel, she taking her turn according to the custom, and coal being supplied after her arrival, at the rate of seven hundred chaldrons a day, in conformity with the previous practice of the company. Such, I think, must have been the customary lay days contemplated by the parties, and if there was longer detention, for want of the usual supply of coal, to the extent of seven hundred chaldrons a day, the shipper is responsible therefor, at the rate stipulated in the charter-party. The respondent presents another ground of defence which deserves consideration. He alleges that this vessel ought to have proceeded directly, and without delay, from Boston to Pictou, but that she deviated, and remained a long time in her home port in Maine, thereby postponing her arrival at Pictou; and that, if she had reached there as early as she might and ought to have done, there would have been a smaller number of vessels to take precedence of her, and a greater daily supply of coal, and that the great detention to which she was subjected after her actual arrival, was, therefore, owing to her own fault.

In the charter-party, the vessel is stated to be lying in the harbor of Boston. It appears by the evidence, that she was in fact at Searsport, in Maine, undergoing repairs, and was detained for that purpose some twelve days. The vessel being represented in the charter-party to be then in Boston, the respondent had a right to expect that she would proceed from that port to Pictou, without any unreasonable and unusual delay, and if she did not do so, it was a violation of her duty under the contract. From the evidence, it appears that, if the vessel had been in Boston, and had sailed for Pictou, and prosecuted her voyage in the time and manner that it is usual and reasonable for such vessels to do, she would have arrived at Pictou on the 19th of August, and the respondent is entitled to be placed in as good a condition as he would have been, if she had performed her duty, and arrived at that time, and the libellant is not entitled to recover for any detention occasioned by his own fault. It is insisted, on behalf of the respondent, that there having been this deviation and delay by the libellant, he can have no claim whatever for demurrage, because it is impossible to ascertain whether there would have been any, or if any, how much detention, beyond the rightful lay days, if the libellant had used due diligence, and arrived in the proper time; but this, I think, is answered by the evidence, which is unusually full and precise. Records were kept by the company of the arrival and loading of every vessel, and of the quantity of coal furnished each day during the season, and it satisfactorily appears that, if this vessel had arrived on the 19th of August, and there had been a supply of coal, up to seven hundred chaldrons a day, she would have been loaded on the fourteenth day of September, taking her turn according to custom, but that with the supply that was actually furnished per day, she would not have been loaded until the second day of October, and thus there would have been a detention of eighteen days, for the want of the usual supply of coal, and for this the shipper must have been responsible, even if the libellant had arrived in due season; and to that extent the delay does not arise from the fault of the libellant. To illustrate this, suppose that at the time this vessel did actually arrive, there had been the same vessels in port having precedence, and the same daily supply of coal, as there were on the 19th of August, and from that time to the 2d of October, then her detention, after her arrival on the sixth day of September, would have been precisely the same, as it would have been, had she arrived on the 19th of August, and thus no part of her detention would have been owing to the fault of the libellant, and the respondent would, in this respect, have suffered nothing from his deviation. I am of opinion, therefore, that the libellant is entitled to recover for eighteen days, at the rate of $30 per day.

The respondent then moved for a stay of judgment or execution.

SPRAGUE, District Judge. This is a motion to stay further proceedings, until a hear-

ing can be had in a cross libel by Tremlett v. Nichols, upon the same charter-party. Before the hearing, a motion for a postponement was made, founded on the pendency of the cross libel. But as evidence had been taken, at great labor and expense, and the case was then ripe for hearing, and involved the same transactions upon which the second suit was mainly founded, the court ordered the hearing to proceed, with permission to the respondent to renew his motion for delay, at a future stage of the cause. That motion is now renewed. Several questions have arisen. The first relates to the service of process. Ever since the filing of the cross libel, Nichols has been out of the jurisdiction and no personal service on him has been made, but notice has been given to his proctor in the first suit. This is not sufficient service.

The libel by Tremlett v. Nichols is not merely defensive. It is not like a cross bill in equity, or a bill to enjoin a judgment, whose whole force is exhausted in repelling the claim of the other party. But it proceeds further; and claims damages upon an independent stipulation, and , to a greater amount than may be decreed to the other party in the first libel. The proctor of Nichols cannot, therefore, by virtue of his retainer in the first suit, be deemed his agent to receive notice in the second. But although no service has been made upon Nichols, so as to authorize the court to proceed upon his default or contumacy, yet the court may, in its discretion, stay proceedings in the first suit, until an appearance shall be entered and other steps taken in the second. Nichols has voluntarily come within the jurisdiction, to litigate upon this charter-party with Tremlett. The latter insists that he has a claim, upon the same contract, exceeding any rightful claim of the former. Upon an adjustment of the whole voyage, nothing may be due to Nichols, and yet if the court has no power to stay proceedings, he may coerce Tremlett to pay a large sum, by a decree of this court, and leave him to seek his remedy on the same contract, in another and perhaps a foreign and remote jurisdiction.

But it is insisted that the present is not a proper case for the exercise of this power. The first objection is, that the cross libel does not present even a prima facie case, and that it is apparent that it cannot be maintained. The principal ground of claim set forth in the cross libel is that there was a wrongful deviation and delay by this vessel, in going to and remaining at Searsport, which caused her late arrival at Pictou, and postponed her arrival at New York, by which the shipper lost the benefit of a contract for the sale of the coal, and by the depreciation of the market value, so that he was obliged to sell at a much smaller price than he would have obtained, if the brig had arrived in due time. This is the same deviation and delay at Searsport, which is set forth in the supplemental answer, and has been already considered in the original suit. It is objected that the shipper cannot maintain a new suit for the same default. This objection cannot prevail. It was set up in the answer, not by way of set-off or recoupment, but merely to repel the claim of the libellant. That suit was for demurrage at Pictou, and in order to sustain it, it was necessary for the libellant to show a detention there by the fault of the respondent. The answer insisted that the detention at Pictou was caused by the previous wrongful deviation and delay by the libellant, and not through any fault of the respondent. This was the view presented by the answer, and the only extent to which it was considered by the court. The cross libel now presents a distinct and independent claim for damages occasioned by that misconduct, on the part of the ship-owner, alleging that the voyage was thereby retarded, and the arrival of the vessel at New York postponed, so that he lost the market for his cargo. This claim the respondent did not present, in answer to the former suit. It may be contended that he might and ought to have set it up in defence of the first suit, and that he cannot now make it the ground of a new action. I think that he might have availed himself of it in his answer to the first suit, although this doctrine has been seriously doubted. The admiralty does not take cognizance of pleas, in set-off, no statute having given it that authority, and it has been thought by some that a distinct claim by the respondent, founded upon the violation of the contract by the libellant, is in the nature of a set-off, and so not cognizable by this court. But I am of opinion that where the counter claim is founded upon the same charter-party, the respondent may set it up in his answer, so that the damages that he has sustained may be recouped from the amount which the libellant might recover. But in such case, if the damages sustained by the respondent should exceed the just claim of the libellant, the court can give no decree for such excess; the utmost effect being to diminish or extinguish the claim of the libellant. Nor could the respondent afterwards maintain a suit for such excess. He cannot be permitted to split up his demand, and litigate the same question twice. Having once voluntarily submitted his claim for damages to the court, he must be content with such relief as the tribunal may afford. him. But although the respondent may set up such claim in his answer to the first suit, yet he is not bound to do so, but may have a separate action therefor, and recover any amount of damages which he may have sustained. Similar questions have heretofore come before this court, in suits for freight,—Snow v. Carruth [Case No. 13,-144],—which may exhibit the principles applicable to the present case. To a libel

for freight, the respondent may answer that some of the goods were lost by the misconduct of the carrier, and never delivered to the consignee, and that the libellant is not entitled to freight for those goods. Here, although there is an allegation of violation of duty on the part of the carrier, yet it leads only to the other allegation of the non-delivery, and is used merely to defeat the claim of the libellant, by showing that it is unfounded. No damages for the misconduct of the carrier are claimed. The respondent, in such case, by his answer might go farther, and claim compensation for the property lost, and that the value thereof should be deducted from the freight to which the libellant was entitled, for that part of the cargo which he had duly delivered.

In some of the cases which have come before me, the whole freight was earned, all the packages having been delivered, but the respondent was permitted to set up and sustain a claim for damage or deterioration of the goods, by the fault of the carrier, and the amount was deducted from the freight earned and sued for. See Snow v. Carruth [supra].

In the case now before the court, the shipper in his cross libel insists that the shipowner violated his contract, by not proceeding directly and with reasonable diligence to Pictou, by reason whereof the vessel did not arrive at her ultimate port in due season, and he was greatly damnified thereby. This claim not having been presented or litigated in the first suit, he is now precluded from pursuing it by a new libel.

It is further objected, that there has been a want of due diligence in instituting the cross suit, which should preclude the respondent from having further delay. The voyage terminated in the latter part of December, 1854. The first libel was filed in February, 1855, and the answer in March following. The cross libel was not filed until December, 1856. This is a great delay. But it does not appear that the respondent had knowledge of the deviation and stay at Searsport, prior to December, 1856. It is true, that in his original answer he states that there was deviation and delay in reaching Pictou, but he states no specific facts, and it may have been mere inference from the date of her arrival. But all the facts were known to the libellant Nichols, and instead of stating them truly, as he ought to have done, in his libel, it is therein positively alleged that the vessel, at the time of making the charter-party, was riding in the harbor of Boston, and that she "departed from said Boston with all possible dispatch for said Pictou," when in truth she was at Searsport, and there remained a long time, undergoing repairs. This positive assertion, which was not retracted until after the cross libel was filed, may well have misled the respondent, and prevented his instituting in-

quiry, and it is not for the libellant to say that he ought earlier to have ascertained that these assertions were false.

I shall order a stay of proceedings for the present, but not until any particular time or event. Perhaps an appearance will be entered, and such stipulations given as will render it proper for the court to proceed to a decree and execution, before a hearing in the cross libel.

Proceedings stayed until the further order of court. 🖉

[Conk. Prac. pp. 89-91, and authorities there cited; Dunn v. Clark, 8 Pet. [33 U. S.] 1.][2]