## LINDSAY, GRACIE & CO. v. CUSIMANO.[*]

*(District Court, E. D. Louisiana.   January 14, 1882.)*

1. CHARTER-PARTY—"CUSTOMARY DISPATCH."

The meaning of the words "customary dispatch" in a charter-party, relative to the discharge of a vessel, construed and explained.   These words, "customary dispatch," mean the usual dispatch of persons who are ready to receive a cargo, and exclude all customs in accordance with which the charterers claim they might, notwithstanding opportunity, decline to receive, simply because it was more advantageous to postpone.

*Kearon* v. *Pearson*, 7 Hurl. & N. 386.

2. CUSTOMS OF THE PORT—OBLIGATIONS OF CHARTERERS AND CONSIGNEES.

The customs of the port cannot qualify the obligation of the charterers and consignees to obtain a berth where the vessel could have "customary dispatch."

*Smith* v. *Yellow Pine Lumber*, 2 FED. REP. 400.

3. BILL OF LADING—UNLOADING CARGO—CHARGES FOR COVERING CARGO AFTER DISCHARGE.

Where the bill of lading provides that the cargo should be delivered from the ship's deck, when the ship's responsibility should cease, the obligation to protect the cargo, after it was placed upon the wharf, was upon the charterers.

*Turnbull* v. *Blocks of Marble*, 9 FED. REP. 320.

The steam-ship Glenbervie, having brought a cargo of fruit from Italy to New Orleans, under a charter-party providing that she should be discharged with customary dispatch, her owners instituted this suit against the consignee to recover demurrage for unusual and unnecessary detention in discharging, and for sundry items of charges made against her by the consignee in settling for the charter-money.

*Joseph P. Hornor* and *Francis W. Baker*, for libellants.

*Charles B. Singleton* and *R. Horace Browne*, for defendant.

BILLINGS, D. J.   The principal discussion in this case has been as to the meaning of the phrase in the charter-party, "to discharge with customary dispatch," and, subordinately, whether the consignees are to pay demurrage for any portion of the 16 days elapsing between the time of the arrival of the ship at the port of New Orleans and the time when the discharging of her cargo was completed.   The testimony shows that it is the custom of the fruit dealers at that port to receive their fruit from the vessels no faster than they can sell it at the wharves.   The fruit could have been received more rapidly and the discharging been sooner completed, but the consignees declined to receive it in any greater quantities than could

---

[*] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

be disposed of. This occasioned delay. Is such delay included in the terms "customary dispatch?"

The obligations of the owners and charterers, when the charter-party is silent as to time to be occupied in discharging, are reciprocal; each shall use "reasonable" dispatch. This obligation is here qualified by changing "reasonable" into "customary" dispatch. This enlarges the source of delay, and makes it include all those usages at the port of delivery which the charterers cannot control, such as the working hours, the order in which vessels must come up to the wharf, the observance of holidays, the allowance of three days to obtain a berth, provided one cannot be sooner obtained; but here their force stops. They cannot be held to include any delay which is purely voluntary on the part of the charterers, although such delay is customary in the fruit trade. The phrase must be confined in its meaning to excuse the parties for want of opportunity by reason of the customs prevailing at the port. This is the substance of the distinction in *Kearon* v. *Pearson,* Hurlstone & Norman, 386. There the question was as to the meaning of the words "usual dispatch," as applied to loading. *Martin,* B., before whom the case was tried, (whose ruling was affirmed by all the judges,) says, page 387, they meant "that the vessel should be loaded with the usual dispatch of persons who have a cargo ready at Liverpool for loading." Here, these words, "customary dispatch," meant the usual dispatch of persons who are ready to receive a cargo, and exclude all customs in accordance with which these charterers might claim the right to decline to receive, simply because it was more advantageous to postpone. If this distinction is observed, all the cases cited are reconcilable. See *Smith* v. *Yellow Pine Lumber,* 2 Fed. Rep. 396; *Nichols* v. *Tremlett,* 1 Spr. 361; and *Sleeper* v. *Puig,* 17 Blatchf. 36.

During the rain, and for a reasonable time after it ceased, the time should not be counted. According to the construction of the charter-party, which must control, the customs of the port could not qualify the obligation of the charterers and consignees to obtain a berth where the vessel could have customary dispatch. *Smith* v. *Yellow Pine Lumber,* 2 Fed. Rep. 400. That is, the custom of discharging cargoes of fruit at or near a particular wharf was not a custom which in the nature of things could exempt them from obtaining a berth when one could be had, where the stipulations of the charter-party could be carried out and the delivery take place with dispatch, limited or qualified by the customs prevailing at the port of delivery which created barriers not under the control of the party who here urges them.

The vessel arrived on the evening or late in the afternoon of January 27, 1880. She finished unloading about 2 o'clock in the afternoon of February 11th. The charter-party seems to show that the unloading would occupy five days, if at the port of New York. It occupied 52 hours, or a trifle over five days, if 10 hours are allowed as the working time for each day. It is difficult to fix with accuracy the time which should be allowed for the rain. I think two days should be added to the five, making seven for unloading, with proper allowance for interruptions from rain. The two Sundays should be deducted. The time of unloading should be counted from the morning of the twenty-eighth of January and include the eleventh of February; this makes 15 days. Deducting five days as proper time for unloading, two days for rain, and two days for Sundays, we have six days remaining, for which libellants are entitled to recover at the rate of £30 per day, amounting to £180, English currency.

The $25 for hire of tarpaulins, and $32 for day and night watchmen, were for the protection of the cargo after it had been placed upon the wharf. By the terms of the charter-party the delivery was to be made to lighters, or the responsibility of the ship was to cease after delivery from deck. It is not attempted to be shown that the delivery was more rapid than the consignees could receive, but for their wishing to sell as delivered. The obligation to protect the cargo after it was placed upon the wharf was upon the charterers. These items should therefore be recovered.

The claim for $33.75, for 15 empty boxes, and the claim for money paid to Bassetti & Xiques, are rejected. The evidence does not show satisfactorily that these claims were not well founded, and the burden is upon the libellants.

Let there be judgment for libellants for $961.40, with interest from judicial demand.