## ELEVEN HUNDRED TONS OF COAL.

*(Circuit Court, D. Maine.   June 5, 1882.)*

1 CHARTER-PARTY—STIPULATION FOR LOADING.

Where the charterers had refused to give lay days, and had insisted upon the insertion of the clause " vessel to load in turn at Sydney according to the custom of the port, strikes and accidents of the mines excepted," and the charterers had written that vessels loading culm or slack coal were not to wait for vessels loading coarse coal, *held* that the stipulation means that the vessel was to take its turn with other vessels loading culm

2. SAME—DEMURRAGE—CUSTOMARY DISPATCH.

Customary dispatch, strikes, and accidents of the mines excepted, would permit the charterer of a ship, where coal is the only article of export, and is always loaded from the mine, to load with all due diligence, working the railroad to its full capacity.

3. SAME—DUE DILIGENCE.

Where the evidence showed that culm piled up near the mine and exposed to the weather is believed to be dangerous, the agents of the mine would not be justified in shipping it without the captain's consent, and it was no want of diligence not to load the earlier vessels with it.

4. SAME—ESTOPPEL.

A letter written by the charterer merely expressing an opinion that the detention will not be great, is not to be construed as a warranty or estoppel.

Libel for Demurrage.

F. P. Shepherd, the libellant, master of the barquentine John Baizley, chartered that vessel June 27, 1881, to D. W. Job & Co., of Boston, to bring a cargo of culm or coal from Sydney, Cape Breton, to Portland, Maine.   The negotiation with the libellant was carried on through Chase, Leavitt & Co., ship-brokers, of Portland, who wrote to Job & Co. June 17, 1881, that they had not been able to induce the owners of vessels to accept orders for Sydney, adding : "We do not suppose you can give lay days at Sydney for loading; if so, we can get vessel without any doubt.   They fear detention at Sydney."   Job & Co. answered the next day, in a letter containing this sentence: "There would not be much detention at Sydney, as the vessels we want would load *slack* coal, and consequently would not have to wait for those taking *coarse* coal."   This letter was shown to the libellant before he made the contract.   The charter-party had the following clause : "It is agreed that the lay days for loading and discharging shall be as follows : Commencing from the time the captain reports himself ready to receive or discharge cargo.   *Vessel to load in turn at Sydney, according to the custom of the port, strikes and accidents of the mines excepted, and discharge with dispatch at Portland.*

And for each and every day's detention, by default of said party of the second part, or agent, ——— dollars per day shall be paid," etc. The words in italics are in writing, the remainder in print. The usage in shipping coal at Sydney is that the miners bring it to the surface and dump it into cars. It passes over a screen, and the coarse or round coal goes into one set of cars and the culm or screenings into another set. The cars are then taken to the port, and the coarse coal is passed through spouts into vessels at one pier, and the culm into vessels at another. There was . but one berth for each class. The usage of all the mines at Sydney is similar. There is no exporting business there, excepting from the coal mines. The International mine, in July, 1881, produced and shipped about 800 tons a day, of which about 150 tons was culm. They had a pile, or bank, of culm at the mine; but this culm is not usually taken for shipment, because it is thought to be more liable to spontaneous combustion than when freshly mined. The railroad was in good order, and the amount shipped was quite as much as usual. The libellant arrived at Sydney July 7, 1881, and reported to the agents of the International mine, in accordance with a direction from the charterers. At this time, three vessels were waiting to load with culm from the same mine. They were loaded in turn, at the rate of about 150 tons a day, ending July 24, 1881. Captain Shepherd hauled into the dock July 25th, and was cleared August 2d. The shipment was suspended for one day, July 27th, by a strike at the mine. On the twenty-first of July the libellant notified the agents that his lay days had expired, and that he should claim demurrage thereafter at the rate of $88 per day. On the day of his clearance he notified them that he claimed demurrage for 10 days, at the rate of $84.32 per day.' When he arrived at Portland, August 12, 1881, he notified Job & Co. that he had been detained at Sydney by steamers and other vessels loading coarse coal, which arrived after him, and that he should not discharge his cargo until this demand, which he states at "about $900," was satisfied. He libelled the coal for freight and demurrage, and a settlement of the freight was afterwards made. The district judge having been of counsel in the cause, it was certified to this court for trial.

T. H. Haskell and W. F. Lunt, for libellants.

C. T. Russell and C. T. Russell, Jr., for claimants.

LOWELL, C. J. This case, upon which others depend, is of much importance to the parties, and has been very thoroughly argued. The main question is, what is the meaning of the stipulation for

loading contained in the charter-party? The charterers had refused to give lay days, and had insisted upon the insertion of the clause "vessel to load in turn at Sydney, according to the custom of the port, strikes and accidents of the mines excepted." Considering that this is part of the agreement concerning lay days, and that the charterers had written that vessels loading culm, or slack coal, were not to wait for vessels loading coarse coal, I cannot doubt that they intended this language to mean that the vessel was to take its turn with other vessels loading culm. The captain, in his letter of August 12th, complains that vessels loading coarse coal, arriving after him, had been dispatched before him; but not only was this the custom, but it seems a reasonable one, because the same vessel never takes both kinds of coal, and therefore it would not hasten the loading of one class to stop loading the other; there being force enough to carry on both at the same time. I hold, therefore, that the turn in loading this cargo refers to vessels seeking a similar cargo.

The counsel for the libellant, at the argument, insisted that if the vessel was to take her turn for culm it was not supplied fast enough. They say that a merchant charterer is bound to have a cargo ready for shipment, and to put it on board in a reasonable time; and that the "custom" mentioned in the charter-party, means only such general usage of the port as refers to the mode of loading a cargo which is at hand. If the latter proposition is sound, no doubt the former is, and I should be bound to inquire whether the three vessels in port, and the libellant's vessel were all dispatched within a reasonable time.

It has been held that when a vessel is to load or discharge in a general port, like New York, Liverpool, or New Orleans, "customary dispatch," or a similar phrase, refers to the general customs of the port, and not to the special usage of the charterer in his business, or to his means of dispatching a ship. *Kearon* v. *Pearson*, 7 Hurls. & N. 386; *Adams* v. *Royal Mail Co.* 5 C. B. (N. S.) 492; *Lawson* v. *Burness*, 1 H. & C. 396; *Sixty Thousand Feet of Lumber*, 2 FED. REP. 396; *Lindsay* v. *Cusimano*, 10 FED. REP. 302. But there is no shipping business at Sydney, excepting in coal, and there are no usages to which the charter can refer, excepting those of the mines. This was frankly admitted in the argument, and, indeed, insisted on. The clause, then, refers to these usages or to nothing. I repeat, in this connection, that it is impossible to doubt that the charterers intended to refer to the usage which all the miners have, for some 40 years or more, adopted and adhered to. I see no reason for saying that the

intention is not well expressed. Nor do I know that the master of the John Baizley was ignorant of it. He has not said so. He knew that there was danger of detention, and that the charterers refused to take the risk of it. I suppose his freight, which was $1.65 a ton, must have been based upon the chance of some delay, because it seems to have been the market rate; and it is probable that the ship-owners of Maine had a general knowledge of these usages, or, at any rate, of the delay resulting from their application, and adopted their rates of freight accordingly.

Customary dispatch, strikes, and accidents of the mines excepted, would therefore permit the charterer of a ship, where coal is the only article of export, and is always loaded from the mine, to load from his mine with all usual diligence, working the railroad to its full capacity, all of which was done in this case. Whether, if other mines at Sydney gave greater dispatch, this contract, referring generally to the usages of the mines, might not require the greatest dispatch given by any mine, I do not decide.

Judge Sprague held, in a somewhat similar case, that the shipper was bound to furnish the usual supply of coal, and charged him with so many days, and only so many, as were lost by his furnishing a less amount. *Nichols* v. *Tremlett*, 1 Sprague, 361. That is the case most like this which I find. The following have some analogy to it: *Harris* v. *Dreesman*, 23 L. J. Ex. 210; *Robertson* v. *Jackson*, 2 C. B. 412; *Ford* v. *Cotesworth*, L. R. 4 Q. B. 127; L. R. 5 Q. B. 544.

In *Hudson* v. *Ede*, L. R. 2 Q. B. 566; L. R. 3 Q. B. 412, the charterer was bound to load in 30 days, detention by ice excepted, and a detention in the river Danube, many miles above the port, excused him, though the port itself was free; it being usual to rely on the river for transportation.

It was proved in *Nichols* v. *Tremlett* that the custom of the mine was to store coal in winter against the needs of shipment in summer. Here there is no such evidence, except that culm is piled up near the mine when there is no demand for it for immediate shipment. But the evidence is that this pile is not usually drawn on for shipment, because culm which has been exposed to weather is believed to be dangerous. The libellant demanded and received some of this culm; but he appears to have run some risk of setting his vessel on fire with it, or at least to have thought so. Upon the evidence, the agents of the mine would not have been justified in shipping this culm without the captain's consent; and therefore it was no want of diligence not to load the earlier vessels with it.

The letter which Job & Co. wrote, and which may have induced the libellant to enter into this engagement, was literally true in representing that vessels for culm do not wait for those which take coarse coal. It was wrong in its inference that there would be any advantage to the libellant from this state of things; because, as it happened, there were more vessels waiting for culm, in proportion to the supply, than were waiting for coarse coal. But as it would be difficult to say what is or is not "much detention," and as the letter appears to have been written in good faith, I cannot hold it to be a warranty or estoppel, but only what it appears on its face to be,— an expression of opinion that the detention will not be great.

Libel dismissed, with costs.