## LEONARD v. WILLIAM G. BARKER CO.

### THE ABENAKI.

(District Court, D. Massachusetts. May 18, 1914.)

### No. 674.

1. SHIPPING (§ 184*)—CHARTERS—TIME FOR DISCHARGING—CUSTOM OF PORT.
    Evidence *held* to establish a custom at the port of Boston that Eastern lumber schooners shall await their turn in discharging and shall discharge in the order of their arrival at the wharf of discharge; also that the customary rate of discharge of such schooners is 20,000 feet per each weather working day.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 596; Dec. Dig. § 184.*]

2. SHIPPING (§ 184*)—CHARTERS—DEMURRAGE—DELAY IN DISCHARGING.
    Where neither the charter nor the bill of lading of a schooner chartered for the carriage of a cargo of lumber contained any reference to demurrage or rate of dispatch in discharging, she was subject to the custom of

the port in that respect, but, where such custom required her to wait her turn at the wharf of the consignee, she was entitled to have vessels preceding her discharged with customary dispatch, and could not be required to await the mere convenience of the consignee; and also, on receiving a berth, she was entitled to customary dispatch in her own discharge and to demurrage for delay caused by the failure of the consignee to receive or provide space for the lumber so that she could discharge at the customary rate.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 596; Dec. Dig. § 184.*]

In Admiralty. Suit by Everett W. Leonard, master of the schooner Abenaki, against the William G. Barker Company. Decree for libelant.

Carver, Wardner, Cavanagh & Walker, of Boston, Mass., for libelant.
Barker & Wood, of Boston, Mass., for respondent.

HALE, District Judge. This is a libel for demurrage, arising from the alleged detention of the schooner Abenaki at East Cambridge in the port of Boston, while discharging a cargo of lumber. The suit is brought by the master, in behalf of the owners of the vessel. On July 2, 1912, the schooner left South Gardiner, Me., for Boston, under an oral charter to Lawrence Bros., with a cargo of 194,063 feet of spruce lumber consigned to the respondent at Boston. Neither the charter party nor the bill of lading contained any reference to demurrage or rate of dispatch. The schooner arrived in Boston on Friday, July 12th, in the afternoon, reported at once to the consignee, and was ordered to the wharf, in East Cambridge, of the Gale Lumber Company, to which company the lumber had been sold. The vessel arrived at the wharf on July 13th, in the forenoon, and found no berth ready to receive her. There were only two berths at the wharf, both of which were then occupied by lumber-laden vessels. The berth on the south, about 200 feet long, was occupied by the schooner Nellie Eaton; and that on the west, about 120 feet long, by the schooner Leo. Both these schooners had arrived earlier than the Abenaki; the Leo on July 3d, and the Eaton on July 11th. The Leo carried 83,745 feet of lumber, and the Eaton 118,293 feet of lumber.

The libelant contends that the Abenaki, on arriving at the Gale wharf, should have been discharged at the rate of 20,000 feet a day; that this was the customary rate of discharge of Eastern lumber schooners in the port of Boston; that at this rate she could have discharged in ten days, or by Thursday, July 25th; that she actually completed her discharge on July 31st; and that for this delay of six days she is entitled to demurrage.

[1] The evidence in the case makes it clear that there is a well-known custom in the port of Boston that Eastern lumber schooners shall await their turn in discharging, and shall discharge in the order of their arrival at the wharf of discharge. This custom is fully recognized by the courts. Belatty v. Curtis (D. C.) 41 Fed. 479; The Viola (D. C.) 90 Fed. 750. The respondent urges that, upon arrival at the wharf, the Abenaki was subject to this custom of the port of Boston; that, pursuant to this custom, the schooner received reasonable and cus-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tomary dispatch in discharging, and was not delayed by the fault of the respondent.

[2] The first question then is: Was the Abenaki delayed in discharging by the fault of the respondent, or of some one for whose misconduct the respondent is responsible?

It is not denied that the respondent is liable for any delay caused by the Gale Lumber Company. The libelant contends that the Gale Company did not use reasonable care in procuring a berth for the Abenaki, or in giving her discharge.

In considering this question, it is necessary to inquire, first, whether the Leo, the schooner preceding the Abenaki at her berth, received customary dispatch in unloading. It is contended by the libelant that the custom of awaiting turns will not, as against a vessel awaiting her turn, excuse the charterer from liability for delay caused by his failure to discharge preceding vessels with due diligence; and it is clear that, if this were not so, the custom might lend itself to a great hardship upon lumber vessels, for a lumber-laden schooner might be kept a long time awaiting a berth, while the consignee held vessels ahead of her for the mere purpose of storehouses. The custom of awaiting turn cannot be invoked for the mere convenience of the charterer or consignee in the conduct of his business. It has often been held that the custom of a port can be used as a reason for delay only when, because of such custom, a vessel is deprived of an opportunity to discharge sooner; and that it cannot be used as a reason for delay when such opportunity is afforded, and, merely for reasons of the charterer's convenience, the discharge is delayed. Lindsay v. Cusimano (D. C.) 10 Fed. 302; Id. (C. C.) 12 Fed. 503, 504.

The testimony in behalf of the libelant tends to show that, when the Abenaki arrived, the Leo was discharging not over 10,000 or 15,000 feet a day; that the Gale trucks came to take the lumber away, after it was put on the wharf, at intervals of two or three hours, sometimes only two or three coming during the day; and that sometimes only about two of Gale's men were at work loading the trucks. There is a sharp contention on this point. It is insisted on the part of the respondent that the delay in discharging the Leo was caused only by the fault of the captain and the crew of the vessel, and not by any lack of facilities for receiving the cargo on the wharf. It is urged, also, by the respondent that there was an unusual accumulation of vessels at the wharf. Upon examination of the proofs, however, I find that there is nothing to show that between July 3d, when the Leo arrived, and July 11th, when the Eaton arived, there was any other vessel than the Leo at the wharf. It appears, therefore, that the Gale Lumber Company had from July 3d to July 11th in which to take the cargo of the Leo away. The cargo consisted of 83,000 feet of lumber; and this was only about half discharged when the Abenaki arrived on July 17th.

It is clear that a vessel awaiting her berth may demand reasonable dispatch under all existing conditions; and I am satisfied that the discharge of the Leo did not meet this requirement. Empire Transportation Co. v. Philadelphia & R. Co., 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623; Tweedie Trading Co. v. Barry (D. C.) 194 Fed. 286.

This brings me to the inquiry: Was there in 1912 any customary rate of discharge of Eastern lumber schooners at the port of Boston? And, if so, what was that rate?

There is a sharp conflict of testimony upon this subject; and the evidence is not altogether satisfactory. Some of the witnesses say that it is hard to fix an average rate for the discharge of lumber cargoes. The testimony for the respondent related largely to the time in which crews of vessels could discharge their cargoes, rather than to the time required by consignees to take the cargo. The vital question relates to opportunities furnished by the consignees for receiving cargoes at a given point, and not to find how much per day the crew of different vessels can discharge. When a charter is made, it is for the ship to inquire what facilities for discharge will be given to her at the port of discharge. The fact that the consignees cannot tell with entire accuracy when vessels are likely to arrive from Eastern ports cannot afford a reason for the failure of consignees to discharge them with due diligence when they do arrive. The time when a vessel has arrived, and has reported, is the time to which the attention of the court is directed, in order to find whether or not reasonable facilities have been afforded to give the vessel a discharge.

In the case before me the inquiry must be: What is reasonably demanded of the party who has the responsibility for the discharge of the vessel? George D. Rogers, a leading shipbroker, is shown to be a man of large experience, with cargoes of spruce and hemlock from Maine and from the provinces. He testified that, in his opinion, the discharge of a vessel of about the capacity of the Abenaki and the Chamberlain would be 20,000 feet per weather working day.

I find that such was the customary rate of discharge of Eastern lumber schooners at this port. In coming to this conclusion, I recognize the difficulty courts have often found in attempting to fix a rate of customary dispatch in a general port where the only testimony in the case is of a somewhat limited range. This difficulty was commented upon by Judge Dodge in Gilbert Transportation Co. v. Borden, 170 Fed. 706, 710, 96 C. C. A. 26; Eleven Hundred Tons of Coal (C. C.) 12 Fed. 185, 187.

The libelant contends further that the Abenaki did not receive reasonable dispatch in discharging after she had obtained her berth on July 19th. The berth was clear for her on July 23d; she discharged about 50,000 feet, and was then compelled to stop, because there was no more available space on the wharf. The testimony of Capt. Leonard of the Abenaki is to the effect that the lumber was piled upon the wharf as high as it was reasonable to pile it under all the circumstances; that it covered all the space provided for it; that, whenever the Gale Company took a truck load or more away, the crew of the schooner put out enough to fill the space; that there was no other reason for the delay in discharging except that the schooner was unable to discharge at the average rate on account of the lack of space on the wharf, and the discharge was thus delayed until July 31st.

It is urged by the respondent that there was a great accumulation of vessels at the time in question. In my opinion, the proofs fail to

sustain this contention. All the vessels whose arrival affects this question are the Leo, the Eaton, the Abenaki, and the Chamberlain. The cargo of the Leo was 83,745 feet. The cargo of the Nellie Eaton was 118,293 feet. The cargo of the Abenaki was 194,063 feet. The cargo of the Chamberlain was 234,848 feet. This made a total of about 631,000 feet of lumber. At the rate of 20,000 feet per day for each of the two schooners, namely, the Abenaki and Chamberlain, or 40,000 feet per day for both vessels, this lumber should have been discharged in 15 or 16 days. Although there is nothing to show that the Leo and the Eaton did not receive berths as soon as they arrived, and although the Leo arrived on July 3d and the Eaton on July 11th, the Abenaki on July 13th, and the Chamberlain on July 17th, the discharge of all four vessels was not completed until August 10th, a period of 38 days. Although the testimony shows that the Gale Company increased its usual force during the time in question, it does not show due diligence on the part of that company in applying its force to the discharge of the Eastern lumber schooners. The evidence before me induces the belief that the respondent was at fault in that reasonable facilities were not furnished on the discharge of the cargo, and in that due diligence was not used in the premises.

As to the value of the use of the Abenaki, the testimony is not very ample. The amount claimed in the libel is $25 a day. From the evidence before me, I think the value of the use of the Abenaki at the time in question was $21 per day.

The Abenaki arrived at Gale's wharf and reported herself ready to discharge on Saturday, July 13th, in the forenoon, with a cargo of 194,063 feet. At 20,000 feet a day for discharge, she could have completed her discharge by July 26th. She actually completed her discharge by July 31th, a delay of five days and a half. She is therefore entitled to damages at the rate of $21 a day for 5½ days, amounting to $115.50.

A decree may be entered for the libelant for $115.50, with interest from the date of the libel, with costs for the libelant.