Choate, D. J.
This is a libel for demurrage against part of the cargo of the schooner Florence & Lilien, which was chartered for a voyage from Port Eoyal, South Carolina, to New York, to carry yellow pine lumber. By this charter-party it was agreed that the rate of demurrage is fixed at $35 per day for each day’s detention “by the default” of the charterers, and that the vessel was to have “ customary dispatch” for the discharging at New York. The charter-party also provided that the cargo was “to be received and delivered alongside within reach of the vessel’s tackles. ” The vessel arrived in New York on the thirtieth of June, 1878, and the master reported to the charterer and was given a berth at pier at foot of Twenty-second street, North river, on July 1st. They commenced discharging the deck load upon the pier, over the side of the vessel, on Tuesday, the second of July. They remained at this place till about noon of Saturday, the sixth of July, when the vessel was moved, by direction of the charterers, to the slip on the south side of the pier at the foot of Chambers street, at which place about 80,000 feet were discharged into the water. On Wednesday afternoon, July 10th, she was taken back to pier at foot of Twenty-second street, and given *397 a berth at the bulk-head on the north side of that pier, and there discharged the remainder of her cargo, through her bow ports, on to the bulk-head. This bulk-head was in the exclusive occupancy of the charterers.
The pier at which the first discharge of cargo was made was a public wharf, which the charterers obtained permission to use for this purpose, their own bulk-head being then so obstructed that it was not available for the purpose of discharging the vessel. The discharge was completed on Wednesday, the seventeenth of July, at about 2 o’clock in the afternoon. The entire cargo was 210,000 feet of resawed lumber.
The libellant claims that the discharge was delayed, by the fault of the charterers, seven days; that she would have discharged her cargo by the tenth of July, if not prevented by the charterers.
It appeared by the evidence that the custom of the port is to allow the charterer in this trade three days to find a berth for the vessel. The claimants insist that a special agreement was made between them and the master in this case, whereby it was agreed that the vessel should go to the pier, to which she went before there was any berth ready for her to discharge at, the purpose being to accommodate the master and allow him to discharge his crew, which he could not do if she lay in the stream, waiting there three days before getting her berth. Such an arrangement is testified to by one of the claimants. It is denied by the master. Upon the whole testimony I am not satisfied that any such special agreement was made. The claimant who testifies to it is evidently on many points greatly at fault in his recollection, and I think he is mistaken on this point, and that the master did not, by any special agreement, waive his right to commence the discharge and deliver the cargo immediately on coming to the pier.
A great deal of testimony has been taken upon the question, what is the amount of lumber of the description of that of which this cargo consisted, ordinarily discharged per day from vessels like the Florence & Lilien. The evidence is very conflicting as to the average amount thus discharged per *398 day during the period of the discharge, but the testimony satisfies me that, with an ordinarily good place to discharge at, the ship can, with an ordinarily diligent and skilful stevedore, discharge 30,000 feet in a day. It may be that the average amount actually discharged daily is less than this, as claimant’s proofs tend to show, but that average would be reduced by all those accidents of unreadiness to receive on the part of consignee’s negligence, or delay of stevedores, bad weather, and other causes which in particular cases may have interposed to protract the discharge; but if 30,000 feet is ordinarily a fair day’s work, as, on the evidence I think it is, then there is nothing in this charter-party which excuses the charterer from receiving and taking it away as delivered from the ship’s tackles, if the master is ready and able so to deliver it; and upon the proofs I also find that the master was ready and able so to discharge and deliver his cargo at the rate of 30,000 feet per day. An attempt was made on the part of the claimants to show that whatever delay there was was owing to the fault of the stevedore. There is considerable conflict in the testimony on this point, but I think that the master, if a credible witness, is the person having the best opportunity to observe the causes of the delay, and the most likely to remember the facts with accuracy. He was interested to have the discharge go forward without interruption, and I think that his positive testimony as to the hindrances to the discharge is not overborne or discredited.
There was some hindrance while they were discharging the deck load on the pier, on account of the passing of people up and down the pier, but the testimony is that notwithstanding this that berth was an ordinarily good one for discharging the cargo. The principal cause of delay was the fact that the consignees did not, at their own bulk-head, keep a sufficient space clear of lumber to enable the vessel to put out her cargo continuously, and did not receive and take away the lumber as it was discharged;
What the vessel was entitled to under the charter-party was “customary dispatch.” That does not mean the acceptance of the cargo in that period of time which is found to be *399 the average time taken to ■ discharge all like cargoes in this port, as the claimants seem to have assumed. It means “dispatch” in accordance with, or consistently with, all known and well-established usages or customs of the port. Thus the customs proved as established in this port, in this particular trade, of allowing the consignee three days to procure a berth, and of allowing him to remove the vessel to a second place of discharge, as to a part of the cargo, are, by the expression “customary dispatch,” adopted and made part of the contract.
But the first of these customs does not excuse the consignee from receiving the cargo immediately when a berth is procured, nor can it be said that the average period of all discharges is a “customary” period. There are no elements of “custom” about such an average period of time. A “custom” is a practice which is universal, or almost universal, in the trade in question. It may limit the length of a day’s work, determine what days are holidays, and similar matters, but the right of the vessel to discharge and to have the consignee to receive the cargo continuously, subject to such customs, is a right established by the law merchant, and one not to be abridged by custom unless the custom is clearly made out;, and the average time which masters, stevedores and consignees take to discharge vessels laden with a certain description of cargo cannot be said to establish any custom, as to time of discharge. So far from being the “customary” time, it may well be that no one vessel ever did discharge in. that particular period of time.
The expression, “customary dispatch,” as affecting the time of discharge, seems to me only to limit the master’s right to discharge continuously in this, that he cannot claim the right to discharge during hours of a day, or during days, which by the established usage of the trade in the port are not working hours or days; nor can he claim the right to discharge so rapidly during any day that the amount to be delivered on any one day is more than the consignee can, according to the customs of the port, with the use of ordinary facilities, be required to receive and take away. No usage or custom is- *400 shown limiting the amount of lumber which a consignee is to receive and take away in a day. Nor is it shown that 30,000 feet is an extraordinary and unusual amount to be discharged and received in a day. On the contrary, the testimony is to the effect that the discharge and delivery of that amount in a day is a common thing.
The consignees were bound to find a berth where the vessel could have “customary dispatch.” This they did not do, either at Twenty-second street or at Chambers street. At the pier and bulk-head they allowed the discharge to be obstructed by the accumulation of lumber, and at Chambers street they gave the vessel a place where she could not discharge continuously, but had to be unmoored from time to time to allow other vessels to pass. The necessary delay in moving the vessel between Twenty-second street and Chambers street was authorized by custom and the vessel must bear that loss. The removal both ways took less than half a day. There was no proof of any delay by reason of bad weather beyond three hours, if so much as that.
As a result of all the evidence I find that the vessel was able to discharge her cargo in eight working days, including the loss of time by bad weather, and by her removal, and that the delay in discharge beyond eight days was caused by tho fault of the consignees. The discharge commenced on the morning of the second day of July, and should have been finished on the eleventh day of July, excluding Sunday and the fourth of July. The libellant is, therefore, entitled to six days’ demurrage, which is fixed by the charter at $35 per day.
Decree for libellant for $210, with interest from July 17, 1878, and costs.