MILBURN v. THIRTY-FIVE THOUSAND BOXES OF ORANGES AND LEMONS et al.

(Circuit Court of Appeals, Second Circuit. August 1, 1893.

1. DEMURRAGE—DELAY BY CONSIGNEE—CUSTOM OF PORT—COMMERCIAL USAGE.
In a charter party the words "to discharge with customary dispatch, * * * cargo to be * * * discharged according to the custom of the

port," do not include a custom whereby all cargoes of fruit are sold at auction by one firm, not more than one cargo being sold in one day, and no cargo being discharged until it has been thus sold, since such custom manifestly has its origin in the sale, and not in the discharging, of cargoes; and for demurrage caused by such a custom the cargo is liable.

**2.** SAME—LIQUIDATED DAMAGES.

Where a charter party provides for demurrage at a stipulated rate per day, payable day by day, and the master makes daily demand for the amount due, interest from the time of such demand should be included in an allowance for demurrage.

Appeal from the District Court of the United States for the Eastern District of New York.

In Admiralty. Libel by John D. Milburn, owner of the steamship Tiverton, against 35,000 boxes of oranges and lemons, Phelps Bros. & Co., claimants, for demurrage. The district court rendered a decree for libelant, but disallowed a claim for interest. Both parties appeal. Reversed.

Statement by LACOMBE, Circuit Judge:

The Tiverton, a British steamship, was chartered to the claimant's Liverpool firm, to carry a cargo of green fruit and other lawful merchandise from Mediterranean ports to New York, by a charter party dated October 16, 1890. The following provisions of the charter are relevant: "To discharge at charterers' covered wharf, * * * and there deliver the same, agreeably to bills of lading, and so end the voyage." "To discharge with customary dispatch." "The cargo * * * to be stowed and discharged according to the customs of the ports." "And shall pay demurrage at the rate of thirty pounds sterling per day, to be paid day by day, for each and every day said steamer is detained over the said time, as hereinbefore stated." "To be consigned at port of discharge to Messrs. Phelps Brothers & Co." A cargo consisting almost entirely of oranges and lemons was loaded aboard at Mediterranean ports, and bills of lading issued therefor, whereby, among other things, it was agreed: "Simultaneously with the ship being ready to unload, * * * the consignee of said goods is hereby bound to be ready to receive the same from the ship's side, * * * and, in default thereof, the master or agent of the ship * * * are hereby authorized to enter the said goods, * * * and land, warehouse, or place them in lighter, without notice to, and at the risk and expense of, the said consignee," etc.

The Tiverton arrived at New York on December 29th and notified Phelps Bros. & Co. the next day of her readiness to discharge. She was duly entered at the customhouse, and permits for discharge issued. The charterers thereupon ordered her to their Mediterranean piers, Brooklyn, where she was duly berthed at 3 P. M., December 30, 1890, on the south side of the northerly one of the two covered piers owned by the charterers, and was unobstructed. There was no other vessel on the opposite or northerly side of the pier where the Tiverton lay, but the steamer Thomas Melville lay at the southerly side of the charterers' southerly pier. The charterers assigned their regular stevedore to the discharge of the fruit, and he was present when the steamer was docked. Both of these piers were covered, and steamers lying at either had equal advantages for discharge, simultaneously, and without interfering with each other. By the custom of the port, January 1st was a holiday. The temperature was proper for the discharge of green fruit on January 2d and 3d, and the steamer Thomas Melville was discharged on those days. Although the Tiverton had equal facilities, and was in all respects ready to discharge, her cargo was left aboard, and received no attention. The weather after Saturday, January 3d, became cold, and the discharge of the Tiverton was not completed until January 13th, or nine days after the discharge of the Thomas Melville. During the winter fruit cargoes are discharged only when the thermometer indicates 28 degrees F., or over. Proof was made upon the trial of a custom in the fruit trade at this port.

which has existed for many years. All such cargoes are sold at auction, and by a single firm of auctioneers. As soon as the steamer arrives at Sandy Hook, the consignee reports her at the auctioneer's store, where a list is kept, and they put down the hour and minute of arrival. During the summer vessels discharge irrespective of the list. In the winter, however, a day is set for each vessel in turn. If when that day comes the thermometer indicates 28 degrees, the auctioneers sell the cargo of the vessel to which that day was assigned, the sale beginning at noon. Discharge commences in the morning of the day of sale, and proceeds, weather permitting, till completed. No other cargo is sold on that day. If the next day is favorable, the cargo of the next vessel is sold, whether the discharge of the one sold the day before is completed or not. No sales, however, are made on Saturday. By this method the consignee of the fruit turns it over from the ship to the buyer, without himself warehousing it. The ship holds it till a purchaser is found, acting as a temporary warehouse meanwhile, and the purchaser is not found, or even sought for, till the day comes, when the auctioneers, having at their convenience sold all earlier cargoes, one a day, are prepared to offer this one on the open market. The only reason why discharge of the Tiverton was not begun on January 2d was because the cargo of the Melville, which had arrived earlier, was offered for sale on that day. The only reason why discharge was not begun January 3d was because fruit cargoes are not sold on Saturdays.

The libelant filed his libel for demurrage at the charter rate of $150 per day for detention, making in all the sum of $1,350. Interest thereon was disallowed by the district court, and a partial appeal against such disallowance was taken by the libelant. The claimant has appealed from the decree in favor of the libelant.

Wm. H. Cochran, for appellant.

E. B. Convers, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge, (after stating the facts.) There is no question of fact in this case. The existence of the custom set up in defense is conceded, and the only point to be decided is whether it is imported into the contract between the parties by the language they have used. The learned district judge did not discuss this point in the brief memorandum he filed with his decision. He had precisely the same custom before him, however, in the case of Steam Co v. Suitter, 17 Fed. Rep. 698, and there held that the existence of such usage of trade did not affect the right of the shipowner to insist upon reasonable promptness in discharging; that it was "unreasonable, and contrary to public policy, to permit the time of discharging a ship of her cargo to depend upon the ability of a single auction house, in the accumulation of business and of other engagements, to effect a sale of such cargo for the owners thereof." The question whether a clause in the charter party providing for "discharge with customary dispatch" was affected by a substantially similar custom at the port of New Orleans, where it was the practice of fruit dealers to receive their fruit from the vessels no faster than they could sell it at the wharves, was also carefully considered by the district and circuit courts in the eastern district of Louisiana. Lindsay v. Cusimano, 10 Fed. Rep. 302, 12 Fed. Rep. 503, 505. It was therein held as follows:

"The obligations of the owners and charterers, where the charter party is silent as to time to be occupied in discharging, are reciprocal; each shall

use 'reasonable dispatch.' This obligation is here qualified by changing 'reasonable' into 'customary' dispatch. This enlarges the source of delay, and makes it include all those usages at the port of delivery which the carrier cannot control,—such as the working hours, the order in which vessels must come up to the wharf, the observance of holidays, the allowance of three days to obtain a berth, provided one cannot be sooner obtained; but here their force stops. They cannot be held to include any delay which is purely voluntary on the part of the charterers, although such delay is customary in the fruit trade. The phrase must be confined in its meaning to excuse the parties for want of opportunity by reason of the custom prevailing at the port. This is the substance of the decision in Kearon v. Pearson, 7 Hurl. & N. 386. There the question was as to the meaning of the words 'usual dispatch' as applied to loading. Martin, B., before whom the case was tried, whose ruling was affirmed by all the judges, says, page 387: 'They meant that the vessel should be loaded with the usual dispatch of persons who have a cargo ready at Liverpool for loading.' Here these words 'customary dispatch' meant the usual dispatch of persons who are ready to receive a cargo, and exclude all customs in accordance with which these charterers might claim the right to decline to receive, simply because it was more advantageous to postpone. * * * Delivery should take place with dispatch, limited or qualified by the customs prevailing at the port of delivery, which created barriers not under the control of the party who here urges them." 10 Fed. Rep. 303.

The distinction thus pointed out is a sound one.   The custom here set up to sell only one fruit cargo a day, and none on Saturdays, is not an outgrowth of the business of discharging ships, but rather of the business of selling their cargoes.   It is manifestly intended to prevent a glut in the market, to keep up prices by holding back newly-arrived fruit till the earlier arrivals have been absorbed by the consumer. It does not interfere with a discharge of the ship, as did the customs as to hours and times of labor, as to routine of access to a single elevator, as to a second change of berth,— which have been held applicable in the cases cited by the appellant. The consignee could have discharged this cargo in seasonable weather on January 2d and 3d, removed it from the dock and warehoused it; and, when the only excuse he gives for not doing so is that, by the custom of his trade, he could not sell it in the ordinary way to consumers until other fruit had been first so sold, he may not turn the ship into a temporary warehouse to hold his goods until he finds a market for them.   We do not determine whether the custom of selling fruit by a single firm of auctioneers, and in restricted quantities, which seems to have existed many years, is or is not reasonable, but do hold it is not the kind of custom which the use of the phrase "customary dispatch in discharging" imports into the contract of affreightment between the parties, being concerned, not with the business of discharging, but with the business of selling, and not creating any impediment to a discharge with dispatch, which the charterer would not have overcome by the use of mere ordinary diligence.

Inasmuch as the charter party contains an express agreement to pay demurrage at the rate above named "in case the steamer is detained over the said time, as above stated," and the steamer was detained nine days over the time agreed upon for unloading, viz. such time as would be required for discharge with customary dis-

patch, the district court correctly awarded demurrage to the libelant.

Such award, however, was without interest, and the refusal to allow it is assigned as error by the libelant. Upon this point the decisions of the eastern and of the southern districts of New York are not harmonious. The Alexandria, 10 Ben. 101; Johanssen v. The Eloina; 4 Fed. Rep. 573; The J. A. Dumont, 34 Fed. Rep. 428. It is unnecessary to add anything to the discussion of the subject contained in those opinions. The amount of the demurrage is liquidated by the contract. Claimants stipulated to pay it day by day, in case they detained the vessel beyond the stipulated time. It was their duty to pay it when they so detained her, and to pay it day by day for each day of such detention, as they contracted to do. The master of the Tiverton demanded daily the amount due. In similar cases interest follows recovery, and there is no adequate reason why demurrage should be subject to any different rule.

The decree of the district court is reversed, and cause remanded, with instructions to decree in favor of the libelant for demurrage, as found by said court, with interest thereon from date of demand, and costs of the district court and of this court.