### TEN THOUSAND AND EIGHTY-TWO OAK TIES.

(District Court, D. New Jersey. June 20, 1898.)

1. DEMURRAGE—DELAY IN DISCHARGING—CHARTER PARTY.

In a charter of a vessel to carry railroad ties a provision that from the time the vessel is reported ready not less than 1,500 ties shall be furnished per running day "for loading at port of loading," and prompt dispatch for discharging at port of discharge," entitles the ship to demurrage for delay in unloading caused by other vessels being previously at the consignee's dock, though, by the custom of the port, vessels are obliged to take their turn.

2. SAME.

If the master, after beginning to unload, intends to discontinue until security is given for demurrage, he should give such timely notice thereof as will enable the charterers to furnish the required security without delaying the progress of the work, or adopt a means by which prompt discharge can be made and the lien of the vessel retained.

This was a libel in rem by Matthew M. Norbury against 10,082 oak ties to recover demurrage for delay in discharging.

Cowen, Wing, Putnam & Burlingham, for libelant.
Horace L. Cheyney, for claimants.

KIRKPATRICK, District Judge. This is an action in rem to recover demurrage claimed by the schooner Rob Roy for delay occasioned in the discharge of a cargo of oak ties at Elizabethport, in this district, the charter providing that the "vessel should have an absolute lien on cargo for freight, dead freight, and demurrage." The Rob Roy was chartered to bring a cargo of oak ties from Charleston, S. C., to Elizabethport, N. J. The vessel arrived at Elizabethport on Saturday, June 1, 1895, at 3:30 o'clock p. m., and the captain immediately reported her arrival to Mr. Finch, the agent of the Central Railroad Company of New Jersey, to whom the ties were consigned, and the same day telegraphed the same to Messrs. Brockie & Welsch, the charterers, who resided in Philadelphia. When the Rob Roy reached Elizabethport there were lying at the dock of the Central Railroad Company of New Jersey three schooners similarly laden with railroad ties, and by reason thereof there was no berth available at which the Rob Roy could discharge. Solely for this reason the Rob Roy was detained at Elizabethport, and the unloading of her cargo was not begun until June 14th. During all the time of this delay Mr. Harriss, the agent of the vessel, was in almost daily com-

munication with the charterers, Messrs. Brockie & Welsch, demanding prompt discharge, and he notified the charterers that demurrage for the delay would be demanded according to the terms of the charter. On the 14th day of June the discharge of the Rob Roy began, and proceeded until the 19th, by which time about 7,000 ties had been unloaded, placed upon railroad cars, and shipped to different points on the railroad, whereby the lien of the vessel for demurrage became limited to the cargo remaining on board. Thereupon, on the 19th day of June, the master notified the consignee and the charterers that be would stop discharging unless his lien for demurrage was secured. On the 20th day of June the master was informed that the consignee assumed no liability for his detention. On the 21st of June Messrs. Brockie & Welsch offered to give security in these words: "In consideration of your delivery of cargo of schooner Rob Roy without attaching for alleged claim of demurrage, we agree to pay demurrage, if any, for which we may be legally liable." On the same day the attorneys for the master of the Rob Roy notified charterers that the schooner would remove to and discharge balance of cargo at nearest wharf where lien could be preserved, unless security were given for demurrage, and asking for answer. To this notice Messrs. Brockie & Welsch replied on June 22d: "We are endeavoring to arrange with owners of Rob Roy for her to continue discharging ties to Jersey Central Railroad without libeling or adopting course outlined by you." No arrangement, however, was made. The libel in this suit was filed, and on the 25th of June the charterers telegraphed that they would "enter security at Trenton." On the 26th of June the unloading was resumed, and continued to finish on the afternoon of the 28th of June. The actual time required for the discharge was seven days.

The clause in the charter upon which the libelant bases his claim is as follows:

"It is agreed that the lay days for loading and discharging shall be as follows (if not sooner dispatched): Commencing from the time the captain reports vessel ready and prepared to receive or discharge cargo, not less than 1,500 ties per running day, Sunday excepted, to be furnished the vessel for loading at port of loading, and prompt dispatch for discharging at port of discharge; and for each and every day's detention by default of the party of the second part or agent 74 dollars per day, day by day, shall be paid by said party of the second part or agent to said party of the first part or agent."

The defendants interposed by their answer these defenses of fact: That the vessel delayed entering upon her charter, and that the master did not report her ready to discharge to the proper officer of the consignee, and that for these reasons the delay of which the libelant complains was occasioned. These allegations are not substantiated by the proofs. I find the facts to be that there was no delay in entering upon the voyage, and that report was made to proper officer at port of destination.

The defendants also insist that the "prompt dispatch for discharging" stipulated for in the contract is so qualified by the succeeding words "at port of discharge" that, taken as a whole, they are simply equivalent to prompt dispatch as regulated or determined by the custom of the port of discharge, and that it being the custom of

the port of Elizabethport for vessels to wait their turn for discharging, and the Rob Roy having been promptly discharged after the work of discharge began, no liability arose for detention in beginning the work caused by her being obliged to wait her turn. It seems to have been the intention of the parties to the contract to provide against delay of the schooner both at the port of lading and discharge. She was to be loaded at the port of lading at the rate of 1,500 ties per day, and be discharged at the port of discharge with prompt dispatch. The words "at port of discharge" were not intended to qualify the prompt dispatch the vessel was to receive in discharging cargo, but to relate to the place where such prompt discharge was to be made. In making this definite and express contract to give discharge with prompt dispatch, the charterers took upon themselves the risk of providing at once a berth from which the discharge could take place, and it is no excuse to show that, by the custom of the port, vessels there take their turn. "Demurrage is a matter of contract, the provisions of which usage cannot modify." Davis v. Wallace, Fed. Cas. No. 3,657. To the same effect is the case of Riley v. Three Thousand Railroad Ties, 38 Fed. 254, where the learned judge, discussing the question of demurrage in connection with usage of the port, says: "If not satisfied to do this [become subject to port usage], he [the master] should have guarded against the danger by stipulating for demurrage." In the absence of express contract, reasonable diligence is all that can be required. To hold that the vessel was bound to wait her turn according to the usage of the port, notwithstanding the stipulation for prompt dispatch, would be to prohibit the parties from receiving that compensation for delays for which it was their intention to provide. Fish v. One Hundred and Fifty Tons of Brown Stone, 20 Fed. 202. Prompt dispatch excludes all delay save the time employed in unloading and delivering cargo, except what is caused by natural causes beyond the control of the party contracting. Under the contract, the charterers were bound to furnish prompt dispatch for discharging. This they failed to do, and such failure was a default on his part such as was contemplated by the charter. Burrill v. Crossman, 16 C. C. A. 381, 69 Fed. 747. "A charter party which made charterer liable for demurrage only when caused by his default did not relieve him for delay caused by omission to perform his covenants, even though he was not guilty of negligence." One Thousand Six Hundred Tons of Nitrate of Soda v. McLeod, 10 C. C. A. 115, 61 Fed. 849.

The libelant being entitled to demurrage, the only remaining question is how much. Under the charter the vessel had a lien on the ties for demurrage, which on the day of the stoppage of discharge had already accrued. By the removal of the ties from the wharf upon the cars of the consignee, the vessel was losing her lien expressly provided for in the charter. There was no place on the railroad wharf of discharge where the ties could be stored. The only course open to the vessel by which the lien could be preserved was that suggested to the consignee and charterers,—to remove to nearest wharf, where the ties could be retained until the question of demurrage was determined. The evidence shows that there was not a

wharf near by suitable for the purpose. The dock suggested had not sufficient water at low tide to float the Rob Roy, and to it the master could not have been expected to go. To have proceeded elsewhere to complete discharge would have consumed several days. This was not desired by the charterers, as is apparent from their telegram of June 22d, in which they say: "We are endeavoring to arrange with the owner of Rob Roy in this city for her to continue discharging ties to Jersey Central Railroad without libeling or adopting the course outlined by you, and hope by Monday to have matters satisfactorily arranged." This was virtually a request for the vessel to remain at Elizabethport and await developments, and it may be assumed that she did so in consequence of this telegram. On the 26th of June unloading was recommenced, and proceeded promptly until vessel was discharged. There is no dispute in regard to the rapidity of the discharge while the work was in actual progress. If the master intended to discontinue discharging his vessel until security were given for demurrage, he should have given such timely notice of his intention to the charterers as would have enabled them to have furnished the required security without delaying the progress of the work, or have adopted a means by which prompt discharge could have been made and the lien of the vessel retained. This course was not pursued by the master. I will not, therefore, award any demurrage from the time when the master arbitrarily stopped the discharging on the 20th of June to the time of charterers' telegram last above referred to, June 22d, a period of three days.

I am of the opinion that, under the contract and the circumstances of this case, the libelant is entitled to demurrage for 14 days. Let a decree be prepared accordingly.