RANDOLPH v. WILEY et al.

(District Court, S. D. New York. October 6, 1902.)

1. CHARTER PARTY—LAY DAYS ON LUMBER CARGO—RULES OF MARITIME ASSOCIATION OF THE PORT OF NEW YORK.

A charter for a vessel to carry a cargo of lumber from Norfolk to New York fixed the rate of freight for rough lumber, and provided that "if any dressed lumber shipped one-fifth off as customary." It further provided that the lay days for discharging should be according to the rules of the maritime association of the port of New York. Rule 5 of such rules allows one lay day for each 25,000 feet of lumber. The cargo brought consisted in part of dressed lumber. *Held* that, in computing the lay days for discharging under the rule, a reduction of one-fifth should be made from the measurement of the dressed lumber, thus reducing it to its equivalent in rough lumber, measured by the freight paid, and presumably in bulk, no custom being shown that the reduction on dressed lumber was made in the rate rather than the quantity.

2. SAME—DEMURRAGE.

Under a charter fixing the rate of demurrage to be paid by the charterer at "customary" dollars per day, the rate recoverable for delay in discharging in New York is not governed by the rules of the maritime association of the port, in the absence of proof that the rate thereby fixed is the customary rate.

In Admiralty. Action against charterer to recover freight and demurrage.

James J. Macklin, for libellant.

Hyland & Zabriskie, for respondents

¶ 2. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

ADAMS, District Judge. This is an action brought by the libellant to recover a balance of freight of $20.27 and six days' demurrage at $49.20 per day, on a cargo of lumber transported by the schooner "T. Morris Perot" from Norfolk, Virginia, to New York in August, 1901. It is not disputed that the freight is due.

The controversy arises out of the terms of the charter party, made between the libellant, as master of the vessel, and the respondents, as charterers, which, inter alia, provides:

"The said party of the second part doth engage to provide and furnish to the said vessel a full and complete Cargo of Dry Boards, Rough and or Dressed and to pay to said party of the first part or agent, for the use of the said vessel during the voyage aforesaid $2.25 and free wharfage per M delivered. *If any dressed lumber shipped, one fifth off as customary.*

"It is agreed that the lay days for loading shall be as customary and for discharging according to rules Maritime Association, Port of New York. If at a Sound Port, as customary. And that for each and every day's detention by default of said party of the second part, or agent, *customary* dollars per day, day by day, shall be paid by said party of second part, or agent to the said party of first part, or agent."

The underlined words were written, the remainder being printed.

The vessel arrived and reported on Saturday, August 17th, and was ordered to the Long Island Railroad Dock. The discharge of the cargo was commenced on the 20th of August and finished on the 10th of September. The cargo consisted of 375,487 feet, of which 138,659 feet were rough lumber and 236,828 feet were dressed lumber. The claim on the part of the libellant is that time for discharging should only be allowed in conformity with the provision for one-fifth off on the dressed lumber, the basis for the calculation of the freight, which would give the respondents 13⅛ days to discharge, and that the demurrage for six days is due at the rate of $49.20 per day, that being the rate established by rule of the Maritime Association of the Port of New York. The respondents claim that the time for discharging should be calculated at 25,000 per day on the basis of the full cargo carried which would allow them 15⅕ days, and that it should be computed at the rate of $15 per day, which, it is said, was the customary rate at the time.

The Rules of the Maritime Association in question, so far as necessary to be considered, are as follows:

### Rule IV.

"Consignees shall have one full calendar day (Sundays and legal holidays excepted) after the vessel arrives and the captain or vessel's agent reports, in which to furnish the vessel with a berth where she can discharge. * * *"

### Rule V.

"Lay days allowed to consignee for receiving cargo shall be as follows, viz: One day to furnish berth for vessel as provided in Rule IV, and one running day (Sundays and legal holidays excepted), for each 25,000 feet of lumber. * * * The first half of every Saturday, not a full legal holiday, together with the last half, or portion known as a half holiday to count as a lay day. If vessel is ready to discharge cargo in questionable weather, consignee must receive same, but in case of failure of vessel through her fault to discharge the quantities per day as herein provided, consignees shall not be liable for demurrage, provided they have furnished berth or lighters as provided in Rules III and IV.

After the days herein provided have expired, consignee shall pay demurrage for every running day until vessel finishes discharging."

Rule VII.

"The charge for demurrage for vessel shall be at the rate of fifteen cents (15c.) per day per thousand feet board measure of entire cargo delivered. All fractions of a day, over one-half, shall be paid for as a full day, and one-half of a day or less be paid for as one-half of a day."

It is substantially agreed that Rules 4 and 5 were referred to and intended to be incorporated in the contract. The libellant contends that Rule 7 was also intended to be incorporated for the purpose of fixing the rate of demurrage, but the respondents deny that the rule has any application in the case and on the trial objected to its admission in evidence for that reason and it was received subject to the objection.

The questions to be determined are: (1) Was the provision for one-fifth off the dressed lumber to constructively reduce the quantity of lumber discharged for the purpose of computing the lay days or were they to be computed on the quantity actually discharged? (2) Was the rate of demurrage to be determined by the Maritime Association Rule 7 or by the ordinary methods of ascertaining the loss suffered by the vessel in consequence of the detention, under a provision for "customary" rates?

(1) It is shown here that the reason for the deduction of one-fifth of freight on dressed lumber is that when it is supplied instead of rough lumber, the vessel's carrying capacity is considerably increased and it is just, therefore, that the charterer should have the benefit thereof without additional charge and the parties have recognized the propriety of a deduction by their contract, but, in so agreeing, have they contemplated that the deduction is to give the charterers time for discharging in addition to what they would have had if all rough lumber was shipped? It is apparent in this case, for example, that if the charterers had shipped rough lumber only, that the quantity on board would have been reduced, but the vessel's freight would not have been reduced because, in that event, the rate of freight would have been $2.25 on the whole cargo instead of $1.80 on a part of the cargo. It may be, notwithstanding the inconsistency, that the parties intended the result claimed by the respondents should follow, but I think such intention should be clearly manifested, especially in an instrument prepared by the party claiming under it, as was the case here, and I fail to find it in the contract. It is agreed that the lay days for discharging should be according to the rules of the Maritime Association. Nothing appears in Rule 4 or 5 which throws any light upon the matter and the respondents ask no consideration of Rule 7 in their favor, so that a possible view that the provision therein for a computation on the "board measure of entire cargo delivered" was meant to cover an allowance of time for discharging according to the quantity delivered, need not be entertained. Moreover, it is doubtful if the rule could properly be so divided as to carry a provision for quantity without the accompanying provision for a rate. It would seem therefore that no further effect can be given to the provision for the rules than to include 4 and 5, and it follows that there is no evidence of intention to allow the charterers additional time for discharging in consequence of the shipment of dressed lum-

ber. Assuming that a deduction of a fifth in the rate represents a corresponding deduction in quantity for the purposes of time in discharging, I find that the quantity delivered, was for demurrage calculation, $138,659 + 189,462 = 328,121$. At 25,000 per day the time allowable for discharging was $13\frac{1}{8}$ days. Between August 20th and September 10th, excluding rainy days when the vessel did not work, Sundays and Monday, September 2d, observed as a holiday, there were 18 days consumed in discharging. The libellant is therefore entitled to demurrage for $4\frac{7}{8}$ days.

The respondents have sought to establish the existence of a custom governing the allowance of time in their favor and claim that the deduction of one-fifth is always made in the rate of freight and not in the quantity of lumber, so that the charterer should have not only the advantage of reduction in paying the freight but also the advantage of more time in discharging. It is evident that it would make no difference in the amount of freight to be paid whether the deduction should be made from the quantity of lumber or the rate of freight and the evidence establishes nothing more than a method of settling by some charterers on the best terms obtainable from vessels, illustrated in this case by an attempt at first to force the captain to settle the freight on a basis of 360,696 feet of lumber—with a reduction of a fifth on 239,596 feet of dressed—when in fact there were 375,487 feet on board, and to settle the demurrage on the basis of a half day's allowance when admittedly $2\frac{4}{8}$ days were due.

(2) The contract, after providing for the ascertainment of the number of lay days by a reference to the Maritime Association Rules, proceeds to arrange for a rate of demurrage, by providing that for each and every day's detention, "customary" dollars shall be paid by the charterers, "customary" being written in a blank space in the printed clause. The parties by a reference to the Maritime Association Rules for the purpose of fixing the number of lay days and by then providing that the rate should be as "customary," obviously intended to exclude the rate contemplated by Rule 7, unless it was the customary rate. Testimony from expert witnesses was adduced by the libellant with the view of showing that it was the custom to rely upon the rule for the rate, but the testimony was contradicted and fails to establish the contention. It does not appear that the provisions of the Maritime Association Rules, in this connection, have become the custom, though sometimes used as a guide, but that on the contrary there has been a general contention among interested parties in this kind of business as to what rates should prevail when described as "customary." It is shown that when rates of demurrage for vessels of this character and in this kind of business are provided for by the charters, they are about $15 per day. It also appears that the earnings of this vessel when employed in this kind of business were about the same. An allowance of $15 per day will meet the requirements of justice here.

Decree for libellant for $93.39 with interest.