GILBERT TRANSP. CO. v. BORDEN.

(Circuit Court of Appeals, First Circuit. May 28, 1909.)

No. 787.

1. SHIPPING (§ 43*) — DEMURRAGE — CONSTRUCTION OF CHARTER PARTY—"CUS-
TOMARY DISPATCH."

A provision in a charter party for "customary dispatch" in discharging
has reference to the local custom at the port of discharge.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 43.*

For other definitions, see Words and Phrases, vol. 2, p. 1806.

Quick dispatch, see note to Harrison v. Smith, 14 C. C. A. 657; Randall
v. Sprague, 21 C. C. A. 342.]

2. SHIPPING (§ 172*)—DEMURRAGE—RIGHT OF CONSIGNEE TO DESIGNATE WHARF
FOR DISCHARGING—AWAITING TURN TO DISCHARGE.

The consignee of a cargo of lumber who had a wharf in connection with
his lumber yard had the right to require the vessel to discharge at such
wharf without liability for demurrage because of delay in awaiting her
turn, where the charter party provided for "customary dispatch" in dis-
charging and the custom of the port required her to await her turn with-
out demurrage.

[Ed. Note.—For other cases, see Shipping, Dec. Dig § 172.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v.
Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

Appeal from the District Court of the United States for the Dis-
trict of Massachusetts.

Robert E. Goodwin (Eugene P. Carver and Carver, Wardner &
Goodwin, on the brief), for appellant.

Richard P. Borden (Slade & Borden, on the brief), for appellee.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

LOWELL, Circuit Judge. This was a libel for the demurrage at
Fall River of the schooner William L. Walker, which had brought a
cargo of lumber to that place. She was under charter for a voyage—
"from Brunswick, Georgia, to Philadelphia, New York, or good Sound port.
One port only for discharging, orders on signing bills lading. * * * It is
agreed that at the rate of not less than forty thousand (40M) feet per running
day (Sundays and legal holidays excepted) shall be allowed for loading com-
mencing from the time the captain or agent reports vessel ready and prepared
to receive cargo, and customary dispatch for discharging."

As stated by the learned District Judge:

"The schooner arrived at Fall River June 10th, was ready to discharge, and
so reported to the claimant on June 11th. Not until June 20th was a dis-
charging berth at the wharf assigned to her. She went into it on that day,
began discharging June 21st, and finished July 3d. In the assignment of a
berth, she had her turn with other vessels, bringing cargoes deliverable to the
claimant, whose arrivals had preceded hers. Between June 11th and June
20th she was awaiting her turn, while such other vessels were being discharg-
ed, and that part of her detention was caused by the fact that she was obliged
thus to await her turn."

It is agreed that the customary rate of discharging pine lumber at
Fall River from a schooner like the Walker, after she is once in the
discharging berth, is 35,000 feet per day.

The libelant contends (1) that the words "customary dispatch" negative any custom at Fall River that vessels shall await their turn without reimbursement for the delay thus caused; (2) that the custom of Fall River, even if applicable, excludes this delay; (3) that upon any interpretation of the charter party the claimant unreasonably delayed the discharge of the Walker by requiring her to await her turn at its wharf instead of sending her to some other wharf in Fall River.

1. The libelant agreed to accept customary dispatch, i. e., dispatch according to custom. As there is no degree of dispatch for the discharge of lumber customary generally without regard to place, it follows that the custom referred to in the charter party is necessarily local in the port of discharge, in this case the port of Fall River. An agreement for "dispatch," without qualification, may exclude waiting turn. Keen v. Audenried, Fed. Cas. No. 7,639. But the word "customary" must be given its fair meaning by way of qualification. Postlthewaite v. Freeland, L. R. 5 App. Cas. 621; Hulthen v. Stewart (1903) A. C. 389; Smith v. Yellow Pine Lumber Co. (D. C.) 2 Fed. 396; Lindsay v. Cusimano (C. C.) 12 Fed. 501. We are thus referred to the custom of the port of Fall River. The libelant contended that this construction of the words "customary dispatch" made them without any effect. In their absence, the custom of the port would fix the rate of discharge. But the charter party fixes the rate of loading, irrespective of custom, and a reference to the custom of the port in fixing the rate of discharge was natural, even if unnecessary. Scrutton on Charter Parties (5th Ed.) p. 259. The custom of Fall River is controlling.

2. There is some conflict of testimony concerning the custom of Fall River as affecting a vessel awaiting her turn. This evidence is stated and reviewed in the opinion of the learned District Judge, and we agree with his conclusion. The custom of Fall River requires a vessel like the Walker to await her turn.

3. The consignee was a lumber dealer whose yard appears to have been connected with his wharf. Upon the evidence it is at least doubtful if there was any other wharf in Fall River generally suitable for the discharge of the Walker's cargo. But even if such a wharf existed, the consignee could not reasonably be expected to accept delivery at a wharf from which the lumber must be hauled to his lumber yard for a considerable distance and at very considerable expense. Under ordinary circumstances it had the right to require the Walker to await her turn at its own wharf. Niver Coal Co. v. Cheronea, 142 Fed. 402, 406, 73 C. C. A. 502, 506, 5 L. R. A. (N. S.) 126, and cases cited. There we observed:

"The same series of decisions has also established the further proposition that, aside from any peculiar custom, the consignee has a right, to a certain extent, to select a particular wharf or berth for discharge of the vessel, although that berth or wharf may be occupied when the vessel is ready to unload, for that reason delaying her; and this, not only under charter parties like those now before us containing the words 'as ordered,' but also where neither these words nor an equivalent expression are found. This is not only the settled law in England, but it is the apparent law in the United States."

The decree of the District Court is affirmed, and the appellee recovers his costs of appeal.

NOTE.—The following is the opinion of Dodge, District Judge, in the court below:

DODGE, District Judge. Libel for demurrage. The libelant's schooner William L. Walker brought this lumber from Brunswick, Ga., to Fall River, Mass., under a bill of lading dated May 4, 1907, in which Robert R. Sizer & Co. of New York are the shippers named, and by the terms of which the lumber was to be delivered at the port of Fall River to them or assigns, "he or they paying freight for the said lumber, with all conditions as per charter party." The charter party thus referred to is dated April 2, 1907, at New York. It is between Sizer & Co. and the schooner's agent, and it contains the following provisions regarding demurrage:

"It is agreed that at the rate of not less than forty thousand feet per running day (Sundays and legal holidays excepted) shall be allowed for loading, commencing from the time the captain or agent reports vessel ready and prepared to receive cargo, and customary dispatch for discharging. If to New York under the rules of the Maritime Exchange of the port of New York. And that for each and every day's detention by default of the said party of the second part or agent, $56 per day, day by day, shall be paid," etc.

The voyage agreed upon was to be from Brunswick to "Philadelphia, New York, or good Sound port." The bill of lading agreeing to deliver the cargo at Fall River appears to have been signed by the master without objection, and neither party has contended here that Fall River is not to be considered a "good Sound port" for the purposes of the case.

Sizer & Co. assigned the bill of lading to the claimant in this case, who carries on business at Fall River as Cook, Borden & Co. The claimant accepted it at Fall River. He occupies a wharf in that port at which cargoes of lumber consigned to Cook, Borden & Co. are received. The schooner arrived at Fall River June 10th, was ready to discharge, and so reported to the claimant on June 11th. Not until June 20th was a discharging berth at the wharf assigned to her. She went into it on that day, began discharging June 21st, and finished July 3d. In the assignment of a berth, she had her turn with other vessels bringing cargoes deliverable to the claimant, whose arrivals had preceded hers. Between June 11th and June 20th she was awaiting her turn, while such other vessels were being discharged, and that part of her detention was caused by the fact that she was obliged thus to await her turn. Once in the discharging berth, it is not claimed that the rate at which her cargo was thereafter received (an average of 35,000 feet per day at least) was less than "customary."

If the charter party conditions entitled the schooner upon her arrival to no quicker "dispatch" in discharging than was given her as above stated, no demurrage is recoverable. But if, as the libelant contends, "customary dispatch" meant that the agreed time for discharge was to include 24 hours after report for providing her with a berth, and one day thereafter for every 35,000 feet of her cargo—not counting Sundays or holidays—and that it was to expire at the end of the period so reckoned, the agreed time expired June 24th, and eight days' demurrage at the charter rate are due, in all $448.

If the language of the charter party had been that the vessel should have "dispatch" or "prompt dispatch" or "quick dispatch" in discharging, the consignee would have been obliged to provide a berth for the vessel upon her arrival at which she would not have to wait for her turn, and he would have been liable for delay caused by his failure to do so. Under an agreement for "dispatch," the consignee has no right to select a wharf already fully occupied, but is bound to receive the cargo as soon as the vessel is ready to deliver it. Keen v. Audenried, 5 Ben. 535, Fed. Cas. No. 7,639; Sleeper v. Puig, 10 Ben. 181, Fed. Cas. No. 12,940, affirmed on appeal, 17 Blatchf. 36, Fed. Cas. No. 12,941. A fortiori, when "prompt dispatch" or "quick dispatch" has been promised. Davis v. Wallace, 3 Cliff. 123, Fed. Cas. No. 3,657; Thacher v. Boston Gaslight Co., 2 Lowell, 361, Fed. Cas. No. 13,850; Ten Thousand and Eighty-Two Oak Ties (D. C.) 87 Fed. 935.

An agreement for "customary dispatch," however, while it excludes customs allowing the consignee, though able to receive, to postpone doing so simply for his own advantage, may allow delays not allowable under agreements of the kinds above referred to, and may include delay through customs

of the port which he cannot control, such as the time allowed for finding a berth, or the order in which vessels are to come to the wharf. Smith v. Yellow Pine Lumber (D. C.) 2 Fed. 396; Lindsay v. Cusimano (D. C.) 10 Fed. 302, affirmed on appeal (C. C.) 12 Fed. 503; Milburn v. 35,000 Boxes of Oranges, 57 Fed. 236, 6 C. C. A. 317.

Both parties have impliedly recognized Fall River as one of the "good Sound ports" at which the cargo was to be discharged according to the charter party. A custom, therefore, of good Sound ports in general, so well established that the parties can be presumed to have contracted in view of it, requiring consignees to provide a discharging berth within 24 hours after report, would settle the meaning of "customary dispatch" for the purposes of this case. The burden is on the libelant to show the existence of such a custom.

It claims to derive some assistance in doing so from the fact that "customary dispatch" as it stands in this charter party forms part of a clause which purports to regulate with some care the time to be allowed for loading and for discharging, and to do this in connection with an agreement that the charterer shall pay at a fixed rate for delay caused by his default beyond the time allowed. But, while the clause referred to obliges the charterer to load within a time capable of being definitely ascertained by calculation, it contains no more specific provision as to the time within which he must discharge than is contained in the words "customary dispatch for discharging"; and there is strong authority for holding that agreements for usual or customary dispatch are not sufficient to bind the charterer to any fixed time, not even to the time usually occupied under ordinary circumstances, but that they leave him excused for delays due to circumstances not within his control. Carver, Carriage by Sea (4th Ed.) § 614; Hulthen v. Stewart (1903) A. C. 389, there cited.

The charterer relies also on the fact that the same clause contains an agreement that the rules of the Maritime Exchange of New York are to govern, if that port is selected as the port of discharge. What those rules provide regarding the discharge of lumber from southern ports appears from Bowen v. Sizer (D. C.) 93 Fed. 227; Randolph v. Wiley (D. C.) 118 Fed. 77; Smith v. Sizer (D. C.) 134 Fed. 928. By rule 4 the consignee has one calendar day after report in which to provide a berth, and by rule 5 one running day is allowed thereafter for each 25, 30 or 35 M feet of cargo, according to the kind of lumber composing it. But in Randolph v. Wiley it was said that the provisions of these rules were not shown to have become the custom of New York, though sometimes used as a guide (118 Fed. 80); and in Smith v. Sizer it was held that an agreement for discharge at New York "as customary" could not be construed as making the rules applicable. Even if the rules could be taken as expressing the custom of New York, and whatever the difficulty of supposing that the parties intended to have the discharge within the time fixed by them if made there, but within a time otherwise fixed or not definitely fixed at all if made elsewhere—the fact that the charter party terms do provide a method of limiting the time at New York, but leave it to be fixed only by "custom" elsewhere, renders it impossible to say that the charter party in any way recognizes the New York rules or the New York custom as the standard for other ports.

The libelant has sought to prove the custom of Sound ports and of Fall River to be as it claims by the evidence of witnesses familiar with the business of chartering vessels to bring cargoes of southern lumber to those ports and to other northern ports. The evidence has not seemed to me sufficient for the purpose. I think it shows at most that cargoes are frequently carried to those ports under agreements that the vessel shall be discharged substantially in accordance with the New York rules, or, in other words, in accordance with what the libelant claims to be the custom. I do not think it goes far enough to establish the existence of such a custom at those ports in the sense necessary to warrant the finding that it is what this charter party means by "customary dispatch."

The claimant's evidence, on the other hand, was that the custom of Fall River requires vessels to wait their turn in discharging. The facts appear to be that the claimant is the only concern there having a wharf at which lumber cargoes brought in vessels not belonging to the occupant are received. At the claimant's wharf cargoes of lumber have been for several years received,

vessels bringing them have been required to discharge, in turn, and no demurrage has been paid for delay so caused. These facts at least prevent the finding that the custom at Fall River is as the libelant contends, and, as above held, no custom of Sound ports has been proved which might be regarded as adopted when the vessel was loaded for Fall River under this charter party. It further appeared that no other wharf in Fall River to which the vessel might have been ordered upon her arrival was provided with facilities for the discharge of such a cargo. It is true that "customary dispatch" in a general port like New York is held to refer to the general customs of the port, and not to the special usage of the charterer in his business, or his special means of dispatching a ship. See Eleven Hundred Tons of Coal (C. C.) 12 Fed. 185, 187. But what is the rule when, as in that case (in which demurrage was claimed for delay in loading), there were no usages to which the charter could refer except those of the shipper? It was said that the agreement to load according to the custom of the port referred to the shipper's usages, or to nothing. So here as to the usages of the consignee.

It was urged on the libelant's behalf that it is to be presumed that "customary dispatch" was intended to secure to the vessel something more than the right to discharge in her turn, to which she would be in any case entitled, even if the charter party and bill of lading had contained no stipulations at all relating to her discharge, as in Bartlett v. Cargo of Lumber (D. C.) 41 Fed. 890; Bellatty v. Curtis (D. C.) 41 Fed. 479; The Viola (D. C.) 90 Fed. 750. Under some circumstances I think such a presumption might be held to exist, and might be entitled to some weight. See Crowley v. Hurd (decided in this court, July 13, 1906) 172 Fed. ——. But in this case the agreement for customary dispatch does not stand as part of an express agreement in regard to "lay days for discharging," and there is no evidence tending to show that any custom whereby the time for discharge can be definitely fixed has ever been recognized by the consignee as applicable to this contract. In the absence of any such evidence and of sufficient proof that the custom asserted by the libelant is so far the custom of New York, or of the Sound ports generally, that both parties can be held on that ground to have adopted it, I am unable, whatever the force of the presumption referred to, to hold that the meaning of "customary dispatch" contended for was the meaning of their agreement. In order to make it certain that the vessel is not to be held to await her turn in ports where the practice of discharge in turn is followed, she should insist upon an express agreement for discharge according to the rules of the New York Maritime Exchange, or within the time which they allow.

The libel must therefore be dismissed, with costs. In view of this result, there is no occasion to consider the other grounds of defense relied on by the claimant, or the claim of damage to the cargo set up in the answer by way of recoupment.