WASSON v. STETSON, CUTLER & CO.

THE H. H. CHAMBERLAIN.

(District Court, D. Massachusetts. May 18, 1914.)

No. 687.

1. SHIPPING (§ 47*)—CHARTERS—TIME FOR DISCHARGING.

Under a provision of a charter party that lay days for loading and discharging shall be "commencing from the time the captain reports himself ready to receive or discharge, customary dispatch and usual conditions at ports of loading and discharge," the stipulation as to the time of the commencement of the lay days for discharging must be given effect; and such time cannot be postponed after the captain has reported himself ready, because of a custom of the port for vessels to await their turn

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for a berth; but, after their commencement, the further provisions as to customary dispatch and usual conditions govern.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*]

2. SHIPPING (§ 47*)—CHARTERS—TIME FOR DISCHARGING.

Under a provision of a charter party for discharge of a cargo of lumber according to the customary dispatch and usual conditions at the port, the vessel has the right, after commencing, to discharge continuously at the customary rate per day, and to have wharf room for piling the lumber supplied so that she may do so.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*]

In Admiralty. Suit by Burtis M. Wasson, master of the schooner H. H. Chamberlain, against Stetson, Cutler & Co. Decree for libelant.

Carver, Wardner, Cavanagh & Walker, of Boston, Mass., for libelant.

Russell, Moore & Russell, of Boston, Mass., for respondent.

HALE, District Judge. This is a libel by the master of the schooner H. H. Chamberlain for demurrage, arising from the detention of the schooner at East Cambridge, within the port of Boston, for ten days in July, 1912, and for $32.50 "dead freight." The written charter to the respondent provided for two voyages from Bridgewater, Nova Scotia, to Boston with:

"Full cargoes dry, planed, or rough hemlock boards, the freight as follows: The first voyage, $3.25 per M feet delivered."

The provision for the discharge of cargo, the only other part of the charter party material for the court to consider, is as follows:

"It is agreed that the lay days for loading and discharging shall be as follows (if not sooner dispatched), commencing from the time the captain reports himself ready to receive or discharge, customary dispatch and usual conditions at ports of loading and discharge."

The Chamberlain arrived at Boston on July 17th, with a cargo of 234,848 feet of lumber, and reported to Stetson, Cutler & Co., the charterer and consignee; she was ordered to the wharf of the purchaser of the lumber, the Gale Lumber Company, in East Cambridge, within the port of Boston. She arrived at the wharf the same day about noon. There were only two berths at the wharf; both were then occupied by vessels with lumber cargoes. The wharf was blocked up with lumber. The schooner Leo was at the west berth with about half her cargo out, filling up the clear space on the wharf. She had reported at the port of Boston July 3d, and was discharging slowly. The schooner Eaton was at the south berth with her full cargo aboard, not having begun to discharge. She had reported July 11th. The schooner Abenaki lay outside the Eaton; the Chamberlain tied up to the Abenaki. Capt. Wasson, the master of the Chamberlain, requested the charterer to furnish him with a berth in which he could discharge; he was told that the lumber had been sold to the Gale Company and must be delivered at the Gale wharf. There being no chance

to discharge for a considerable time, the captain went home, leaving his brother in charge, authorized to take the discharge whenever he was furnished facilities. Capt. Wasson returned to Boston July 29th, and found conditions not materially changed, as he testifies, except that the Leo was gone, the Abenaki had taken her berth, and was about half discharged. The Eaton was also about half discharged and working slowly. She had got into her berth July 12th. She had not, however, begun to discharge until after the Abenaki had begun her discharge, some time after July 22d. A space about 30 feet wide had been cleared for the Eaton on the wharf; but she had filled that space up on July 29th, and was working only two or three hours a day. The Abenaki left the wharf July 31st; the Eaton did not get discharged until August 1st. The Chamberlain then took her place. The captain's testimony shows that the wharf was blocked up with the Eaton's lumber, there being no place on it where the Chamberlain could discharge; that she was forced to wait until August 2d for a space to be cleared; that the captain complained to Gale's superintendent, Mr. Sterritt, and was told by Sterritt that the more the captain bothered him the longer he would keep the vessel, and, if he bothered him too much, he would "keep the Chamberlain there for a storehouse"; that, after a clear berth was obtained on August 2d, the Chamberlain was able to land only about 20,000 feet of lumber. This filled all the available space to a height of six feet. No more space was then cleared until August 5th, when enough was cleared for the balance of the cargo to be taken care of as discharged. The discharge was completed August 10th at noon.

[1] Under the provisions of the charter that lay days for loading and discharging shall be "commencing from the time the captain reports himself ready to discharge, customary dispatch and usual conditions at ports of loading and discharge," the libelant contends that the schooner Chamberlain was not obliged to submit to any custom of the port as to awaiting turn for berth, but was entitled to have the purchaser of the cargo ready to take it away as soon as the schooner reported herself ready to discharge.

The learned proctor for the respondent urges that, notwithstanding the language of the contract in respect to lay days, the words "customary dispatch," as they are used, import the true meaning that the lay days shall commence when, in accordance with customary dispatch, a berth is given, namely, when the vessel gets her berth "in turn."

After a careful examination of the question, I am constrained to accept the libelant's view of the construction of the charter party. There is an express stipulation in the contract that the lay days, both for loading and discharging, shall commence when the captain reports himself ready. The clear meaning of the further provision is, I think, that, after the captain reports himself ready to discharge, he shall receive customary dispatch and be subject to usual conditions at the port of discharge. If the lay days are to begin to run from the time the captain reports his readiness to discharge, then the custom of awaiting turn for a berth cannot be applied before the period of discharge begins.

The interpretation of the contract urged by the respondent entirely fails to give any meaning to the stipulation that lay days for discharging shall commence from the time the captain reports himself ready to discharge.

It appears that, in the charter party, the stipulation for the beginning of lay days is printed, while the words "customary dispatch for discharging" are typewritten. Where there is a conflict between the written and the printed provisions of a charter party, there is a presumption in favor of the written provision. In the construction of the charter party before me there is no conflict between the two provisions. I give effect to the proposition that lay days are to commence from the time the captain reports himself ready to discharge. I give effect also to the provision that after the lay days have begun, namely, during the period of discharge, customary dispatch and usual conditions at the port of discharge shall prevail. In this construction there is nothing in the charter party, either written or printed, which it is necessary to reject. The familiar rule is that, so far as possible, such a construction shall be adopted as will give effect to all provisions of an instrument, and not make it necessary to reject some and give greater effect to others.

The charter party is similar to that in Crowley v. Hurd (D. C.) 172 Fed. 498, 501. In that case, the custom of the port of New York was found to require consignees to furnish a berth within 24 hours after arrival, and did not require a vessel to await her turn. If the custom in New York had required vessels to await their turn, such a custom could not have been given effect in the case before the court, on account of the express provision of the charter party, which was, as in the case at bar, that lay days for discharging should commence from the time the captain should report his vessel ready for discharge, and then should have customary dispatch while discharging. The court in that case referred to Bartlett v. Cargo of Lumber (D. C.) 41 Fed. 890, and Bellatty v. Curtis (D. C.) 41 Fed. 479, and said:

"In neither of these cases was there any charter party, and the bill of lading, in both of them, contained no provision whatever on the subject of demurrage. An agreement that the vessel should have 'customary dispatch,' inserted, as was the case here, in the charter party as the agreement of the parties in regard to lay days for discharging, must, I think, be considered as presumably intended to secure for the vessel something more than the mere right to be discharged in turn, which she could claim in any event, without any express agreement."

In Gilbert Transportation Co. v. Borden, 170 Fed. 706, 96 C. C. A. 26, the court had before it a state of facts in which the agreement for discharge with customary dispatch was not connected with the provision that the lay days should commence at a stipulated time. That case is authority for the construction which should be given in this circuit to the words "customary dispatch." The court held that the agreement for "dispatch," without qualification, may exclude awaiting turn, but the word "customary" must be given its fair meaning by way of qualification, citing Smith v. Yellow Pine Lumber (D. C.) 2 Fed. 396; Lindsay v. Cusimano (C. C.) 12 Fed. 504. In Hinckley v. Wilson Lumber Co. (D. C.) 205 Fed. 974, 979, the court, in the Maine dis-

trict, gave substantially the same interpretation to the words "customary dispatch," holding that those words meant discharge with due diligence according to the lawful, reasonable, and well-known custom of the port of discharge.

The cases cited above give a clear interpretation to the words "customary dispatch." This interpretation must be applied to the charter party in the case at bar; it affects the rights of the parties after the period of discharge begins.

In Carbon Slate Co. v. Ennis, 114 Fed. 260, 261, 52 C. C. A. 146, the charter party contained the provision that the lay days were not to commence to run until 12 o'clock noon after the vessel was entered at the customhouse and ready to load. This was construed to amount to a stipulation that the lay days were actually to commence at that time. The court held that, where such explicit statement as to the beginning of lay days was inserted in the charter, no custom of awaiting turn for berth could be given effect. The force of the opinion is that the stipulation of the time when lay days commence is to have distinct and positive effect; and that it overrides any custom as to awaiting turn.

[2] Among the "usual conditions at the port of discharge" is the condition relating to the rate of discharge at the port of Boston. In the case of the Abenaki, I have found that the customary rate in the port, and at the wharf, where the schooner was to be discharged is 20,-000 feet per weather working day. It is clear, then, that, when the Chamberlain had reported ready to discharge, she was entitled to be given discharge at once, and have the discharge proceed continuously at the customary rate per day. She had the right to expect a clear space afforded her on the wharf; she had the right to assume that dockage for piling the lumber should be supplied with reasonable promptness, and that, when unloading commenced, the lumber would be discharged continuously and with customary dispatch. Williscroft v. Cargo of the Cyrenian (D. C.) 123 Fed. 169; Crowley v. Hurd (D. C.) 172 Fed. 498, 501; Smith v. Yellow Pine Lumber (D. C.) 2 Fed. 396.

The evidence induces me to believe that the Chamberlain was delayed in discharging by the fault of the respondent. It shows the respondent at fault in failing to procure a berth for the Chamberlain when the captain reported her ready for discharging, and thereafter in failing to give her customary dispatch in discharging.

I have found that, by reason of the provision of her charter party, the Chamberlain was not obliged to submit to the custom of awaiting turn for a berth, but was entitled to a clear berth and to facilities for discharging as soon as she reported herself ready to discharge. Demurrage began to run July 17th at noon, when she reported herself ready to discharge. At the average rate of 20,000 feet per day for discharge, and with a cargo of 234,848 feet, she could have been wholly discharged in 12 working days, or by July 31st at noon. She did not, in fact, complete her discharge until August 10th at noon, a delay of ten days. For this delay she is entitled to damages for demurrage.

The evidence leads me to the conclusion that the value of the use of the Chamberlain was $25 per day. She is entitled, therefore, to recover demurrage in the sum of $250.

It is further contended in behalf of the Chamberlain that, under the contract, she was to be furnished for the two voyages to which the charter relates with "full cargoes dry, planed, and rough hemlock boards." The evidence is that the capacity of the Chamberlain for dry, planed, or rough boards was 260,000 feet. The respondent tendered freight on 250,000 feet, leaving a balance of 10,000 feet on which freight has not been paid or tendered. On this amount, at the rate of $3.25 per M feet, the libelant claims demurrage in the sum of $32.50.

In reference to this claim, the respondent contends that Capt. Wasson represented the capacity of the schooner to be 250,000 feet. This the captain denies, and says that he always called the capacity of the schooner 260,000 feet. A witness for the respondent testifies that, when the charter was negotiated, Capt. Wasson gave 250,000 feet as an estimate of the capacity of the schooner. It appears that such an estimate, if made, was not a warranty as to the capacity of the schooner, but a mere estimate for a certain purpose. I cannot disregard the clear testimony that the capacity of the schooner was 260,000 feet. I therefore allow the libelant for freight on the balance of 10,000 feet at $3.25 per M feet, namely, the sum of $32.50. This allowance is spoken of by courts under the name of "dead freight." Hinckley v. Wilson Lumber Co. (D. C.) 205 Fed. 974, 979, 980.

The libelant is, then, entitled to a decree for the sum of $250 for demurrage, and for the sum of $32.50 for "dead freight." The decree will be for the libelant for the sum of $282.50, with interest from the date of the libel, and with costs for the libelant.