## SUTTON *v.* HOUSATONIC R. Co.[1]

*(District Court, S. D. New York.* February 10, 1891.)

1. WHARFAGE—UNSAFE BERTH—VESSEL'S RIGHT TO REFUSE.
    The master of a vessel, on learning of obstructions likely to injure his vessel at her designated berth, is justified in refusing to go to such berth until it is made safe, and may hold the consignee for the delay.

2. DEMURRAGE—CONSIGNEE LIABLE.
    Under a bill of lading which states that consignee is to pay the freight and discharge subject to the conditions of a bill of lading which provides for the payment of demurrage by the consignee, such consignee, on receiving the cargo without objection, is liable for demurrage, though caused by a third party whom he has engaged to discharge.

3. SAME—GUARANTY—DEPTH OF WATER.
    A stipulation in a bill of lading guarantying a certain depth of water to the vessel at her discharging berth renders such consignee liable for the delay caused by the lack of such depth.

In Admiralty. Suit to recover demurrage.

*Henry D. Hotchkiss* and *Mr. Maddox,* for libelant.

*Daniel Davenport,* for respondent.

BROWN, J. In actions brought against wharfingers for damages caused to vessels by obstructions in the slips and along the docks, it is a good defense, wholly or in part, that the vessel had notice of the obstruction, and did not exercise reasonable care and diligence in avoiding it. *The Stroma,* 42 Fed. Rep. 922; *Christian* v. *Van Tassel,* 12 Fed. Rep. 884. And see *Crossan* v. *Wood,* 44 Fed. Rep. 94; *The Calliope,* L. R. 16 App. Cas. 11. From this it follows that when the master of the Ives, which drew 15 feet, ascertained that at the berth where the ship was directed to go there were stones in the mud within a less depth than her draught of water at low tide, he was justified in refusing to go to the berth until it was made safe. He was not bound to take the risk of running upon the stones, or of settling down upon them, and of thus testing whether the mud would yield so much and so easily as to do his vessel no harm. Mr. Olds was the agent of the defendant railroad company, the consignee of the coal, and also of the New England Terminal Company, which was the lessee of the wharf, and had the sole control of discharging vessels there. It was no doubt the duty of the latter to keep the slip free from injurious obstructions. The bill of lading shows that the cargo of coal was received by the defendant through Mr. Olds as their agent under this bill of lading, and that Mr. Olds acted in their behalf in noting the time of arrival and of discharge by his indorsements thereon. The terminal company discharged the coal into the defendant's bin, and the evidence shows a detention of the vessel 10 days beyond the time provided in the bill of lading. The cause of this delay was in part the removal of the obstructions from the slip, which the captain demanded, and in part the slow rate of discharge afterwards, said to have arisen from the fact that the vessel was not brought close up to the wharf, where

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

spiles had been put down by the company, though they afterwards appeared to have been unnecessary. It may possibly be that, as between the New England Terminal Company and the defendant, the former should indemnify the latter for the delay in the discharge of the Ives; but this, I think, does not debar the libelant's claim directly against the defendant under the terms of the bill of lading, which expressly states that the consignee should pay the freight, and discharge subject to the conditions of the national bill of lading, which provided for demurrage at the rate of $54.20 per day upon such cargoes as this, to be paid by the consignee or his assignee. The acceptance of a cargo under such a bill of lading without objection imports an agreement to pay demurrage as well as freight according to its terms. *Neilsen* v. *Jesup*, 30 Fed. Rep. 138; *North German Lloyd* v. *Heule*, 44 Fed. Rep. 100. The express stipulation in the bill of lading, moreover, that 16 feet of water was guarantied, would likewise make the respondents liable for any delay caused by the lack of that depth of water at the berth assigned her. If the consignor had no authority to insert such a guaranty, it was competent for the consignee on the arrival of the ship to refuse to accept the consignment on those terms by giving prompt notice to the master. This was not done. On the contrary, Mr. Olds, as agent of the defendant, noted the arrival on the bill of lading, and undertook to receive the cargo for the respondents, as well as to manage the discharge on behalf of the terminal company, without objection. *The Swallow*, 27 Fed. Rep. 316.

It is set up in the answer, but not proved, that by the contract between the consignor and the consignee the former was to make delivery into the respondent's bin on the wharf without charge to the defendant. But the bill of lading was plainly inconsistent with this agreement, as it imposed the payment of freight, as well as of demurrage, upon the consignee. It appears that the captain had no knowledge of the agreement alleged, and relied, as he was entitled to rely, upon the provisions of the bill of lading; and, as I have said, no objection to its provisions was made. I must hold the claim for demurrage against the defendant, therefore, legally established, whatever may be the latter's right, if any, to look to others for indemnity. Decree for libelants for $544.20, and costs.