CROWLEY v. HURD.

(District Court, D. Massachusetts. July 13, 1906.)

No. 1,441.

1. SHIPPING (§ 47*)—DEMURRAGE—CONSTRUCTION OF CHARTER—CHANGE OF PORT OF DELIVERY.

Where a charter of a vessel to carry a cargo of ties to Boston, to be discharged with customary dispatch, was changed by consent of the parties to make the port of discharge New York, instead of Boston, the other terms of the charter to remain unchanged, the effect was to substitute the customary dispatch of the new port, if there was any difference between that and the old.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 47.*]

2. SHIPPING (§ 47*)—DEMURRAGE—CUSTOMARY DISPATCH IN DISCHARGING.

The rules of a maritime association of a port relating to the time allowed for discharging cargo are not conclusive as to what constitutes customary dispatch at such port, as applied to a charter the parties to which were not members of the association.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 47.*]

3. SHIPPING (§ 177*)—DEMURRAGE—CUSTOMARY DISPATCH IN DISCHARGING.

Customary dispatch at the port of New York for discharging a cargo of railroad ties *held* to require that the vessel be given a berth within 24 hours after she reported, and be discharged thereafter at the rate of 50,000 feet, board measure, each working day.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 582; Dec. Dig. § 177.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

4. SHIPPING (§ 177*)—DEMURRAGE—DELAY IN DISCHARGE—REFUSAL OF BERTH.

A chartered schooner laden with ties *held* within her right to decline a berth at New York, where she would have projected some distance beyond the end of the pier, and thus been in danger from currents and from other vessels, and where the cost of discharging, to be paid by the vessel, would have been increased because of her inability to lie alongside for the whole length.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 581; Dec. Dig. § 177.*]

5. SHIPPING (§ 174*)—DEMURRAGE—PARTIES LIABLE.

Where the consignee of a cargo, named in the bill of lading, which ran to him or his assigns, did not assign the same, and received the cargo, and paid the freight, he cannot avoid liability for demurrage on the ground that he acted only as broker in the transactions.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 571; Dec. Dig. § 174.*]

In Admiralty.

Carver & Blodgett, for libelant.
Russell & Russell, for respondent.

DODGE, District Judge. Libel for demurrage. A charter party was made July 25, 1902, on behalf of the schooner J. C. Strawbridge, for a voyage from Wilmington, N. C., to Boston with a cargo of cypress ties. The charter party was signed on her behalf by the libelant as her agent. There is no dispute that he was her agent, and duly authorized to act for her owners in the management of the vessel. The charterer was the Hall Tie & Lumber Company, whose name was signed "by J. A. Hurd & Co., per authority," and it was so signed by the respondent, Joseph A. Hurd, of Boston, who then did business under the name of Joseph A. (or J. A.) Hurd & Co., and was duly authorized by the Hall Tie & Lumber Company to sign as above.

The schooner went to Wilmington, there took on board a cargo of ties in accordance with the charter, and her master thereupon gave a bill of lading for it, dated August 22, 1902. This recited that the schooner was bound for Bay Ridge, New York, N. Y., instead of Boston, as agreed in the charter party, and the undertaking on the part of the schooner, as expressed in the bill of lading, was to deliver the cargo "at the aforesaid port of New York" "unto Jos. A. Hurd & Co., or to their assigns," he or they paying freight at 11½ cents per tie, as per charter party, "with all conditions and without prejudice to charter party dated in Boston July 25, 1902." It is admitted by the answer that the substitution of Bay Ridge for Boston as the port of delivery of the cargo was made at the respondent's request. It was agreed to at Wilmington by the master upon the condition that the freight which he was to receive and all the other terms of the charter party should be preserved without change as they stood.

The schooner brought the cargo to New York, and was ordered to deliver it at the wharves of the Long Island Railroad at Bay Ridge. She reported there, and was ready to deliver the cargo, on September 1, 1902. Her discharge was not completed until September 25, 1902. The libelant claims that nine days' demurrage, at least, is due, at the charter rate of $75 per day.

The provisions of the charter regarding discharge were that the "lay days for discharging" should be, commencing from the time the captain should report his vessel ready to discharge, "customary dispatch for discharging," and also that the above rate of $75 per day should be paid for each and every day's detention by default of the charterer.

The first question is: Did the schooner have customary dispatch in discharging? If there is any difference between customary dispatch as understood at Boston and customary dispatch as understood at New York, I have no doubt that it is the New York meaning of the term with which this case is concerned. By their agreement, made when New York was substituted as the discharging port, that the other terms and conditions of the charter party should be preserved, I cannot believe that the parties intended that the customs or understanding at Boston were to govern a discharge to take place at New York. Their agreement to change the discharging port must be taken as involving an agreement to adopt the custom of the new, instead of the custom of the original discharging port, if any difference existed

between them. This seems to me the natural and obvious construction of their contract as it stood after the bill of lading had been given.

What, then, was customary dispatch in discharging, at New York, in the case of such a cargo as this? The libelant offered the printed rules of the Maritime Association of the Port of New York, published in 1905, and contended that customary dispatch was as stated in rule 9 of the "Rules Regulating the Delivery and Receipt of Southern Pine Cargoes, etc., in force February 13, 1902," on pages 80 and 81 of said printed rules. Rule 9 is as follows:

### "Rule 9.—Regulating the Delivery of Railroad Ties.

"Consignees shall have twenty-four hours (Sundays and legal holidays excepted) after the vessel arrives, and the master or the vessel's agent reports, in which to furnish the vessel with a berth where she can discharge.

"At the expiration of said twenty-four hours vessel's lay days shall commence, except that, in case consignees have given orders within the allotted time, and vessel fails to report at berth before noon, her lay days shall not begin until the morning following.

"Lay days allowed consignees for receiving cargo shall be as follows, viz.:

"Twenty-four hours to furnish a berth as provided in above rule, and one running day (Sundays and legal holidays excepted) for every fifty thousand (50,000) feet, board measure, of the ties."

The above rule was objected to by the respondent, but admitted in connection with other evidence tending to show that it stated a custom prevailing and recognized in New York.

The parties do not appear to have been members of the association, so as to be bound as such by its rules. The mere fact that the association had adopted the above rule does not, of course, suffice to make it part of those customs of the port of New York in view of which contracts for delivery of cargoes there must be assumed to be made. But, on the evidence before me, I think it is sufficiently shown that there is a custom of New York, governing the discharge of cargoes of ties there, which is, to some extent at least, substantially in accordance with the provisions of the rule quoted above.

Three shipbrokers, each of long experience in carrying on their business in New York, and each accustomed to deal with cargoes of ties to be delivered there, testified as witnesses for the libelant that the customs of the port required consignees of such cargoes to find a berth for the vessel within 24 hours after arrival, and did not require the vessel to wait her turn after all other vessels which might have arrived before her with cargoes for the same consignee. And the agent of the Long Island Railroad, in charge of its wharves at Bay Ridge, where this cargo was received, who was accustomed to receive cargoes of ties there, and who was in charge there when this cargo was received, called as a witness by the respondent, admitted on cross-examination that in this respect the rules represented the custom of New York as he understood it, and that he understood, also, that the rules were to govern the discharge of this cargo. The libelant's evidence on this point was not contradicted.

In Bartlett v. Cargo of Lumber, 41 Fed. 890, decided in the District Court for the Eastern District of New York in 1890, it was held that the custom of that port in regard to discharging cargoes of lumber required the vessel to wait her turn. A similar decision, involving the

usage at Boston with regard to lumber cargoes, was made in this court in the same year. Bellatty v. Curtis, 41 Fed. 479. But in neither of these cases was there any charter party, and the bill of lading, in both of them, contained no provision whatever on the subject of demurrage. An agreement that the vessel should have "customary dispatch," inserted, as was the case here, in the charter party as the agreement of the parties in regard to lay days for discharging, must, I think, be considered as presumably intended to secure for the vessel something more than the mere right to be discharged in turn, which she could claim in any event, without any express agreement. Nor can it be regarded as at all impossible that, with regard to cargoes of ties, a custom may have become established since 1890 different from that which then prevailed with regard to cargoes of lumber in general. I think the agreement of the parties must be construed as requiring the consignee or his representative to provide a discharging berth within 24 hours from the time of report, or on or before September 3d; September 1st being a holiday.

As to that part of rule 9 which requires the discharge to proceed at the rate of 50,000 feet, board measure, per running day, Sundays and legal holidays excepted, after the vessel is in her berth, I am less well satisfied that it can be said to set forth what is a settled custom of the port, because, while the libelant's witnesses referred to testified that such was the fact, and no New York witness was called to contradict them, I think that upon this point there is more reason to apprehend that their testimony may be based only on the fact that charters for such cargoes to be delivered at New York very often adopt the rules by express reference. Nor does it so clearly appear that the railroad considered itself bound by this part of the rule as by that part which requires a berth to be provided within 24 hours. I have no doubt, however, that, once in her berth, the custom of the port requires that a vessel entitled to dispatch must be discharged with reasonable dispatch, and on the evidence, in the absence of any unusual circumstances excusing the consignee, this would require the discharge to proceed, so far as he was concerned, at a rate not less speedy than that prescribed by the rule. This vessel was in fact discharged very nearly at that rate. The discharge began on September 12th and was completed at 2:30 p. m. on September 25th. September 14th and 21st were Sundays, so that a little less than 12 days were actually occupied. As there were 14,885 ties, each of 36 feet, board measure, a discharge at the rate prescribed by the rule would have taken 10.71 days, and it appears that the actual discharge was delayed part of one afternoon while the vessel's stevedore shifted his gear from one hatch to another, and on other occasions by rain, during which both parties appear to have been satisfied to suspend operations. In determining the meaning of the charter party as to the time which it allowed the consignee to occupy in discharging the vessel without becoming liable for demurrage, I think I am justified by the evidence in finding that reasonable dispatch would be at the rate of 50,000 feet per day, and that the lay days, therefore, expired 24 hours after report and 10.71 days thereafter. This makes the lay days expire, not counting Sunday, September 14th, on September 15th, and makes the demurrage days

begin with September 16th, and leaves 9 days at least for which the schooner is entitled to compensation.

It is contended by the respondent that a discharging berth was offered the schooner on September 4th, which she refused to take, and that her refusal prevents her from recovering for any delay thereby occasioned. There is no dispute that the berth offered on the 4th was a berth astern of the Herbert Fuller, a vessel which was being discharged at the wharf when this schooner reported. There was some space alongside the wharf ahead of the Fuller, between her bow and the shore. Into this the schooner made some attempt to get, but found that she could not safely do so unless the Fuller were moved astern, and this was not done on account of objection by the Fuller. There was space alongside the wharf astern of the Fuller, but not enough for the schooner to lie there clear of the Fuller with her whole length alongside the wharf. She could have lain there, clear of the Fuller, with some part of her length projecting beyond the wharf, and this was the berth offered her on September 4th as above. If she had occupied it, her forward hatch would have been t' only hatch in such position as to permit discharging from it, and to discharge the deck load the ties would have had to be carried forward on the vessel, instead of being put directly over her side upon the wharf. This would have increased the stevedore's charges, which were to be paid by the vessel. I find, also, on the evidence, that if she had occupied the berth referred to she would have projected astern beyond the end of the wharf sufficiently to raise a reasonable question as to her safety, by reason of currents which ran past the end of the wharf, and from the passage of other vessels. On these grounds the berth was declined. I find that they were sufficient grounds to justify the declination, and that the berth was not, under the circumstances shown, a reasonably safe and convenient one for the schooner to occupy while discharging.

The respondent refused to pay a bill for 8½ days demurrage sent him November 5, 1902, on the ground that, if there was any delay, it was on account of the railroad company, and not on his account, as he had turned the vessel over to them. This he stated in a letter to the libelant dated November 6, 1902 (Exhibit 9). And the answer sets up that the respondent had no interest in the cargo, having acted only as a broker in obtaining the charter party and bill of lading.

Whatever the respondent's interest in the cargo, he and no one else is the consignee named in the bill of lading. By the bill of lading the cargo was to be delivered to him or his assigns, and it is not claimed that he ever assigned it. The delivery is therefore to be considered as made to him, and the railroad company, in receiving it, must be regarded as his agent. There is nothing in the case which is sufficient, in my opinion, to show any notice to the vessel that any consignee other than the respondent himself was accepting delivery of the cargo, or intending to accept it. In an interview, on or about September 3d, between the respondent and the master of the schooner, the respondent, in reply to the master's complaint that no berth was then available, told the master that he would send a representative to New York to see about the matter, and did not in any way intimate that the

delivery was to be to any one other than himself. To letters written him by the master on September 11th and 14th (Exhibits 3, 4), complaining of the delay and warning him that a demurrage claim would arise, he replied by a letter, dated September 16th (Exhibit 5), that he had taken the matter up with the Long Island Railroad and asked them to give the vessel all possible dispatch, again with no intimation that the cargo was to be delivered to or received by any one but himself. Finally, upon the discharge of the vessel, the respondent paid the freight, with no attempt to claim that any one but he was bound to pay it. I should be strongly inclined to hold, on the evidence, that he was the legal owner of the cargo during all this time. But, whether he was owner or not, since he accepted the delivery as consignee under this bill of lading, he is bound by the bill of lading and its reference to the charter party, not only to pay the freight, but any demurrage which may have accrued in the vessel's favor. The Elida (D. C.) 31 Fed. 420; Sutton v. Housatonic R. R. Co. (D. C.) 45 Fed. 507; Gage v. Morse, 12 Allen (Mass.) 410, 90 Am. Dec. 155.

The remaining defense set up in the answer is that the libelant was notified during the discharge that the respondent would not be responsible for any demurrage that might be claimed, should the cargo be discharged free of the vessel's lien therefor; but that the cargo was nevertheless discharged without the assertion of any lien. Such a notice, if seasonably given, might be construed as a refusal by the consignee to receive the cargo at all, unless all claim upon him save for freight should be waived; but upon the evidence I am entirely satisfied that no such notice was ever given. On the contrary, the evidence leaves no doubt in my mind that before or during the discharge both the master and the libelant himself were told by the respondent, in substance, in answer to inquiries by them whether the cargo was to be proceeded against for the demurrage claim, not to hold or delay the cargo, that he did not want any trouble of that kind, and that he would be responsible.

There is to be a decree in favor of the libelant for nine days' demurrage at $75 per day, or for $675, with costs.