### THE CORFE CASTLE.

(District Court, E. D. New York. February 15, 1915.)

1. SHIPPING ☞170—DEMURRAGE—RIGHT OF ACTION BY LIGHTER.

A shipper, holding a permit from a steamship for delivery of cargo thereto, employed lighters of libelant to make such delivery. By the custom of the port and the rules of the Produce Exchange a lighter was entitled to be discharged within 48 hours, and to charge demurrage at the rate of $10 per day thereafter; notice to be given to its employer each day during the accruing of demurrage. *Held* that, in view of the fact that there was an express contract between the steamship and shipper under which the delivery was made, there was no implied contract which would support an action for demurrage by libelant directly against the steamship; his right of action being against the shipper.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 565–567; Dec. Dig. ☞170.]

2. SHIPPING ☞170—"ORDINARY DEMURRAGE."

"Ordinary demurrage" is a claim by the vessel or the owner of the vessel against the charterer or the cargo; or it may be a claim by the charterer against some person failing to perform a maritime duty to the vessel.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 565–567; Dec. Dig. ☞170.]

In Admiralty. Suit by the Water Front Contracting & Lighterage Company against the steamship Corfe Castle; Norton, Lilly & Co., claimants. Decree for claimants.

Frederick W. Park, of New York City, for libelant.
Russell T. Mount, of New York City, for claimants.

CHATFIELD, District Judge. The libelant alleges two causes of action, involving exactly similar propositions, against the steamer

Corfe Castle, on implied contract for demurrage, arising from the time taken at Bush's Stores Dock by the representatives of the American & African Steamship Line to transfer certain cargo from the lighters of the libelant to that steamer, while the said steamer was being loaded at that dock.

It is admitted that the steamer was at Pier 2, Bush's Docks, foot of Forty-Ninth street, Brooklyn, upon the occasions in question. The lighters sent by the libelant for the purpose of delivering the cargo arrived at the times alleged, and the cargo was not taken on board until the dates claimed. In one of the instances, the particular lighter was taken away, but a smaller lighter left in her place, the cargo being transferred; and the proofs have therefore made the denial of knowledge by the claimant upon that point an immaterial issue.

It is also admitted that the rate of demurrage claimed, $10 a day, is the customary rate in the port of New York for such a service, and is a reasonable charge.

The claimants do not deny that the goods carried upon the lighters, which were certain cases of oil from the Corn Products Refining Company, were intended as a part of the cargo of the Corfe Castle, and were finally carried upon the voyage in question.

In accordance with the custom of the American & African Steamship Line, permits torn from a book furnished by the steamship line were made out in the following general form, and signed by the agents of the steamship company, at the request of the Corn Products Refining Company, which hired the lighters to make the deliveries in question.

Form of receipt:

**American & African Steamship Line,**
Norton & Son, Agents.

Use American & African Steamship Line receipts only.

New York,...........

To the Clerk of S. S. ..........,
    For ..........
Receive from .............................................................
the undermentioned packages subject to the conditions of steamer's bills of lading.
................................................................................
................................................................................
To be delivered on or before ...................................................
    All goods must be prominently port marked.
Steamer at
    Pier 2, Bush Docks,
Foot of 49th St., Brooklyn.

    .............,
    Pro Agents.
All risk of fire or flood while goods are on the dock to be borne by shippers.

No freight received after 5 p. m.; Saturdays, 12 m.

The receipts on the second occasion differ only in that the words "on or before" were stricken out, so that the permit read, "To be delivered December 24th."

The libelant has offered in evidence certain rules of the New York Produce Exchange, admittedly binding upon its members, and also evidence to the effect that there is a custom in the harbor of New York for lighters to charge demurrage at the rate of $10 a day, when more than 48 hours are consumed in unloading the barge, exclusive of Sundays and holidays. These rules of the Produce Exchange, adopted February 4, 1875, and amended at various times up to August 2, 1912, after providing for various matters (including the charge of $10, and for 48 hours as lay days, etc.), contained the following:

"Rule 6.—In all cases where demurrage is being incurred, it shall be the duty of the lighterman to give the employer notice by furnishing him with bill of demurrage not later than 12 o'clock m. on each day, in order that the employer in his turn may have an early opportunity of claiming from the ship's agents or others who may be liable to him in the matter; and in case of the neglect of this duty by the lighterman, whereby the employer shall have lost his claim for demurrage, then such amount of demurrage so lost shall be borne by the lighterman."

It will be noticed that this rule is intended to give the employer an opportunity to reimburse himself from any one liable therefor to the amount of the demurrage which he has incurred to the lighterman.

Rule 3 provides that, after the expiration of the lay days:

"Demurrage shall accrue against each *shipper, consignee, shipowner, or* ship agency, as the case may be."

Rule 4 (B) provides for but one bill of demurrage, if the shipowner is to pay the charge, when two or more deliveries are made on one lighter.

It is shown by the record that the question of responsibility for the hire of lighters, over a period of delay caused by the failure of a ship or consignee to receive the goods from the lighter within the period of 48 hours, has been the occasion of much dispute, but little litigation has resulted or progressed to the point of decision.

The railroad companies transmitting goods for shipment to foreign ports, and all lines of steamships receiving goods for foreign shipment, have a substantial interest in this question, and under the interstate commerce law, by Act June 29, 1906, c. 3591, 34 Stat. 586, § 2 (Comp. St. 1913, § 8569), the published tariffs of the interstate commerce railroads include a provision requiring the steamship company to provide a berth and receive the load from the lighter within two days after reporting, after which time demurrage shall accrue at the rate of $10 a day against the steamship company.

This provision was construed in the case of Lehigh Valley Railroad Co., Central Railroad Co. of New Jersey, and New York Central & Hudson River Railroad Co. v. Anchor Line, Limited, 219 Fed. 716, 135 C. C. A. 388, by the District Court for the Southern District of New York (affirmed December 15, 1914, C. C. A.). In the court below, it was held that the railroad companies, even under the authority and direction of the interstate commerce law, could not impose the obligation of this penalty for delay upon foreign steamship companies, inasmuch as the statutory authority of the Interstate Commerce Commission did not cover the acts of the steamship companies with respect thereto.

The decision was confined strictly to an attempt to enforce the statutory penalty, and the opinion expressly says that the court is relieved from considering—

"whether the 'permit' constitutes a contract for the violation of which damages for delay (commonly called demurrage) may be collected."

And again:

"The alleged custom of issuing permits and then paying no attention to them, or asking for permits and then doing nothing, suggests interesting questions. But these libels do not demand demurrage in any true sense; they are really filed to recover a species of penalty."

On appeal, the opinion does not pass upon the question of the jurisdiction of the statute, but affirms the decision because there was no contract as to the demurrage charges shown between the steamer and the other parties.

The claimants herein have cited the cases of Randolph v. Wiley et al., 118 Fed. 77, Smith v. Robert R. Sizer & Co., 134 Fed. 928, and Crowley v. Hurd, 172 Fed. 498, as authority for the proposition that the rules of the Produce Exchange are not binding upon the claimants in the present action, unless it be affirmatively shown that they are members of the Exchange. This would seem to be a reasonable conclusion, unless, as is said in Randolph v. Wiley, supra, the rules referred to have become a custom in the port.

As was held in the cases just cited, a customary rule in the port will be recognized, and it would appear from the evidence in the present case that the' rules of the Maritime Exchange are in accord with the recognized custom that a lighterman is entitled to charge $10 a day demurrage (against any party liable) for the time consumed in receiving the cargo of a lighter beyond the period of 48 hours after reporting, exclusive of Sundays and holidays.

As also held in the cases just cited, and in the case of Gilbert Transp. Co. v. Borden, 170 Fed. 706, 96 C. C. A. 26, the responsibility for demurrage is (unless expressly made the subject of contract) a recognized liability on the part of the party bound by the charter to accomplish the discharge of the ship within the expected—that is, the customary—time and at the customary rate.

The case of Williams v. Theobald (D. C.) 15 Fed. 465, reviews, on pages 468 to 471, inclusive, many early cases, and the origin of the liability is plainly expressed in the decision by Sir James Mansfield, in Burmeister v. Hodgson, 2 Camp. 488, to the effect that:

"The law could only raise an implied promise to do what was usually stipulated for by express covenant, viz., to discharge the ship in the usual and customary time for unloading such a cargo."

Further, the claimants cite the case of The Ask (D. C.) 156 Fed. 678, in which the court refused to allow the charterer to amend his libel, so as to bring in a cause of action sought to be alleged by a third party who had been acting through the charterer and for whom the charterer claimed to be a trustee.

It is evident that the doctrine of subrogation by assignment of a claim could not be extended so as to cover a mere agency or authority

to act as attorney in fact. The agent or attorney could not bring an action in his own name, and as if in his own right, upon the mere explanation that he was in reality seeking to enforce a legal right of another party and was accountable therefor if successful. But the question determined in The Ask Case, supra, is not conclusive in the present situation.

The only case cited by either party, suggesting the precise facts of such a situation as is presented in the present action, is that of White v. North German Lloyd S. Co., 61 Misc. Rep. 268, 113 N. Y. Supp. 805, in which a shipper sought to hold the railroad company and also the steamer for failure to convey as freight upon the steamer certain apples which had been delivered by the railroad company to the steamer, under a permit issued by the steamship agents, dated February 28, 1907, for the receipt upon March 4th of the apples in question. The shipper, in order to make certain the carriage of the goods upon that steamer, added the words "a. m." to the date for delivery, and the steamer appears to have been ready to receive the goods up to 1 p. m., but thereafter was under such compulsion for storing other freight that a part of the apples could not be taken on board when they were delivered at about 3 o'clock.

The case has nothing to do with the question of demurrage, except in so far as the court, which held the railroad liable and exonerated the steamer, used the following language (61 Misc. Rep. on page 272, 113 N. Y. Supp. on page 807):

"At most the permits constituted an offer by the defendant steamship company to receive the apples on board its steamer, but did not bind the plaintiffs to deliver them. It therefore lacked the element of mutuality and could not bind the defendant."

And, again, the court says, that the permits—

"were mere instrumentalities of convenience, employed by the steamship company to facilitate the classification, distribution, and loading of the cargo."

It is evident that the contract was unilateral; that is, until the permit was used, no obligation at all rested upon the steamship company, and the contract of the railroad company in that particular case was apparently subject to the exact arrangement between the shipper and the steamer.

It was unnecessary, therefore, for the court to determine whether the shipper might compel the steamer to live up to a different contract than that which he himself acted upon, and whether he could have insisted that the steamer reserve space for his freight. In other words, the determination that the paper in that case was nothing but a permit was (upon the facts of the case) plainly correct, and the liability of the railroad company was not relieved by what would have happened if a different contract between the shipper and the steamer had been shown.

But in so far as there seems to be a decision that a permit of this nature could create no obligation at all, and hence by inference that no damages as to the method of receipt or treatment of the goods could arise therefrom, such decision was unnecessary to the result of that case, and is not therefore conclusive upon the question.

If the shipper acts upon the permit, and the paper is presented to the steamer, it necessarily invests the shipper and the lighterman with all the rights that are recognized by law in such a transaction. If the goods are received by the ship, then the permit constitutes one of the circumstances entering into the contract of carriage. If the goods are not received by the ship, a determination that the ship was not, in the White Case, supra, bound to receive them, nor liable for damages because of its refusal to do so, does not preclude the determination of the rights of the parties in other cases growing out of the events up to the time of such a refusal.

We have therefore now presented the direct question whether the lighterman or common carrier (having shown a custom in the port, and as expressed in the rules of the Produce Exchange, to accept delivery within 48 hours, and to be entitled to charge demurrage against the party liable, at the rate of $10 a day thereafter) can treat the ship as the owner of a vessel would treat a charterer or the cargo, and can directly collect from the new carrier—that is, the steamship—the demurrage which undoubtedly, under the rules of the Produce Exchange, could be first demanded and collected from the parties employing the lighter, and in turn by subrogation exacted at their hands from the steamship, if the contract between the shipper and the steamship makes the steamship responsible therefor.

By analogy to the case of The Ask, supra, it is evident that the shipper could not set up a cause of action against the steamship, solely on the ground that the lighter might or might not have a right of demurrage against some one, and the shipper could make such a demand only upon payment of the demurrage and subrogation to the liability therefor.

The libelant suggests that under the doctrine of Lawrence v. Fox, 20 N. Y. 268, the lighterman should be allowed to enforce a liability against the steamship which he claims is recognized to be made by the shipper for his (the lighterman's) benefit. It does not seem that such a situation is presented, nor that any contract is shown in which the lighterman is interested, so as to give him a cause of action against the steamer, on the theory of Lawrence v. Fox, supra, nor do the rules of the Produce Exchange help the libelant. On the contrary, the simple method indicated by those rules would seem to be the obtaining of a provision in the permit that the steamer would be liable for demurrage if the shipper was compelled to pay the same. But that liability cannot be enforced against the person giving the permit (in the absence of express contract) unless a right of action therefor is established by statute or by custom.

The attempt under the interstate commerce law to create such a liability by statute seems to have failed to meet the situation, and no custom has been proven other than the recognized right of the lighterman to charge his employer for the time of his employment.

The libelant's claim, therefore, must depend solely upon implied contract, if one is created by the acceptance of and action upon the offer contained in the permit issued by the steamship agents. These permits contemplate the completion of a contract for carriage. They

hold out to the person receiving them the right to act in accordance therewith. The lighterman making the delivery and having in his possession the permit is invested with the rights, so far as exercising the permit is concerned, of the Corn Products Refining Company, to which it is issued. If damage is caused by the act of the steamship company, contrary to the rights established by the permit, then the steamship company is liable therefor. If a lighterman, in possession of one of these permits, were assaulted or injured in such a way that the steamship company were responsible, his possession of the permit would establish his rights for protection. In a similar way, the possession and action under the permit invoke the customary treatment of the goods offered, and are a sufficient basis to entitle the holder of the permit to damages for a violation of the recognized rights of any one acting under the permit.

It seems to be satisfactorily established that the rights of a person acting under such a permit are to be relieved of the goods within 48 hours, exclusive of Sundays and holidays, unless delay is caused without the fault of the receiving party, viz., the ship which has issued the permit. This is exactly the sort of right which has given rise to the allowance of demurrage against a cargo or consignee, but such damage is for the loss of services of the boat, at the hands of the party hiring the use of the boat.

The libelant in the present instance claims in addition the right to collect such demurrage from a party which it thinks is bound to respect the needs of the owner of the boat, and to respect that owner's reliance upon the period of 48 hours as sufficient time in which to have his boat freed from the cargo thereon. But why should he undertake the protection of his employer, who may or may not have the right to enforce such protection?

It has been decided that, where custom or recognized principles of law affect the case, no implied contract can exist against a third party. In the case of Dunwoody v. Campbell, 106 Fed. 542, 45 C. C. A. 464, a libel was filed for demurrage against a steamer for delay in loading lumber at the port where the cargo was taken on. The court says that the relations between the persons furnishing the cargo and the ship were not set forth in the libel, and that the court could take cognizance of the fact that nearly all of the contracts of lading at that port provided that the charterer should pay the expenses of loading and expressly regulated the respective duties of the charterer with the ship. The court in that case disregarded the allegation that the detention was not by the hirers (that is, the charterers), but solely by the master of the vessel, and, inasmuch as the ship was not liable under express contract, held such general allegation was insufficient to make the ship liable ex delicto, or under any contract that could be fairly implied.

[1] It is rather difficult to see how the court could, upon exceptions to the libel containing this allegation, determine that the ship would be liable for no wrongdoing. But in so far as the case disposed of the claim for demurrage against the ship, it apparently decides that where a charterer is liable for the hire of a barge, and where a rule or cus-

tom exists protecting the barge owner with reference to such liability, any claim for demurrage must be presented by the party who can show, either upon the pleadings or by testimony, that he has suffered a loss because of a breach of either express or implied contractual duty to him and not to a third party.

[2] Ordinary demurrage is a claim by the vessel or the owner of the vessel against the charterer or the cargo; or it may be a claim by a charterer against some person failing to perform a maritime duty to the vessel. But it would be a forced construction of a charter party to hold that the owner of the vessel could ignore making his claim under the charter for the use of the vessel, and file a libel against some person who he thinks has caused the violation of those rights and incurred liability to the person bound by the charter to unload the vessel within a certain time or pay a penalty therefor.

It is difficult to see how an implied contract can be worked out by which rights would be established in direct contradiction of the express provisions of the usual charter. Where no written charter exists, but where the vessel is merely delivering goods to a steamer upon a permit, and is hired for the purpose, it does not seem that the right of demurrage claimed to exist against the cargo or the party hiring the boat, and which is recognized by the Produce Exchange rules, should be disregarded, and an implied contract established by the decision of the court which would revoke the express contract admittedly in existence. If the libel should be filed against the contracting parties, and the steamer can be brought in under rule, a question would arise which is not presented in this case.

The libel will be dismissed.